Exhibit 8
Plaintiffs' Motion for Partial Summary Judgment

PIKE REPORTING COMPANY

# CASE NO. 1:20-cv-03650-RMR-STV

# ANITA BERTISEN AND JASPER BERTISEN

# V.

# THE TRAVELERS HOME AND MARINE INSURANCE COMPANY

## DEPOSITION OF:

## LINDA MCGOWAN

## DATE:

## JUNE 7, 2022

PIKE REPORTING COMPANY
YOUR PATH THROUGH LITIGATION

(855) 693-3767 | (720) 738-1300
schedule@yournextdepo.com

www.pikereporting.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Case No. 1:20-cv-03650-RMR-STV

ANITA BERTISEN AND JASPER BERTISEN,

Plaintiffs

VS.

THE TRAVELERS HOME AND MARINE INSURANCE COMPANY,

Defendant

DEPONENT: LINDA MCGOWAN

DATE: JUNE 7, 2022

REPORTER: JODI WILSON

APPEARANCES

ON BEHALF OF THE PLAINTIFFS, ANITA BERTISEN AND JASPER BERTISEN:
Katherine Goodrich, Esquire
Rodney Monheit, Esquire
MOGO LLC
600 Seventeenth Street
Suite 2800 South
Denver, Colorado 80202
Telephone No.: (303) 357-1317
E-mail: katie@mogollc.com
(Appeared via videoconference)

ON BEHALF OF THE DEFENDANT, THE TRAVELERS HOME AND MARINE INSURANCE COMPANY:
Brian E. Devilling, Esquire
Foran Glennon Palandech Ponzi & Rudolff PC
222 North LaSalle Street
Suite 1400
Chicago, Illinois 60601
Telephone No.: (312) 863-5000
E-mail: bdevilling@fgppr.com
(Appeared via videoconference)



INDEX


| | Page |
|---|---|
| PROCEEDINGS | 5 |
| DIRECT EXAMINATION BY MS. GOODRICH | 6 |
| CROSS EXAMINATION BY MR. DEVILLING | 40 |
| REDIRECT EXAMINATION BY MS. GOODRICH | 62 |


EXHIBITS


| Exhibit | Page |
|---|---|
| 1 - Professional Qualifications Linda M. McGowan, P.E., A.I.A., Traveler_000964 | 10 |
| 2 - E-mail from Seth McClure dated June 16, 2020, Travelers_001057 to Travelers_001059 | 18 |
| 3 - Travelers Document Appraisal Letter, Travelers_000281 to Travelers_000282 | 19 |
| 4 - Summary Letter and Analysis Email, Travelers_001082 to Travelers_001085 | 19 |
| 5 - Appraisal Award, Travelers_001094 to Travelers_001097 | 30 |
| 6 - E-mail from Linda McGowan dated March 16, 2021, Bertisen_000825 | 33 |




STIPULATION

The deposition of LINDA MCGOWAN was taken at PIKE REPORTING, 600 17th Street Suite 2800, Denver, Colorado 80202, via videoconference in which all participants attended remotely, on TUESDAY, the 7th day of JUNE 2022 at 1:11 p.m.; said deposition was taken pursuant to the COLORADO Rules of Civil Procedure. This notarial act involved the use of communication technology pursuant to 8CCR 1505-11.

It is agreed that JODI WILSON, being a Notary Public and Court Reporter for the State of COLORADO, may swear the witness.



PROCEEDINGS

COURT REPORTER: We are now on record. Will all parties except for the witness please state your appearance, how you are attending, and your location, please?
MS. GOODRICH: Hello. This is Katherine Goodrich. I'm appearing on behalf of Anita and Jasper Bertisen in this matter. And I am appearing from Granby, Colorado.
COURT REPORTER: Fantastic.
MR. DEVILLING: Brian Devilling for Travelers appearing from my home office in Michigan.
COURT REPORTER: Okay. And then Kate, would you just speak for Rodney for me, please?
MS. GOODRICH: Yeah. And Rodney Monheit is also appearing on behalf of Anita and Jasper Bertisen. And he's appearing from Massachusetts.
COURT REPORTER: Okay. Fantastic. Thank you so much. All right. And, Ms. McGowan, did I say that correct?
THE WITNESS: It's McGowan.
COURT REPORTER: Oh, McGowan. Awesome. Will you please state your full name for the record?
THE WITNESS: Linda Marie McGowan.
COURT REPORTER: All right. Will you please

hold your ID up to the camera for me? And that's perfect. Do all parties agree that the witness is, in fact, Linda McGowan?
MS. GOODRICH: Yes.
MR. DEVILLING: Yes.
COURT REPORTER: All right. Ms. McGowan, will you please raise your right hand for me? Thank you. Do you solemnly swear or affirm that the testimony you're about to give will be the truth, the whole truth and nothing but the truth?
THE WITNESS: I do.
COURT REPORTER: All right. You may begin.
DIRECT EXAMINATION
BY MS. GOODRICH:
Q All right. Ms. McGowan, thank you so much for appearing today for your deposition. As you just heard, my name is Katie Goodrich. And I'm appearing on behalf of Anita and Jasper Bertisen in this matter. Now, Anita and Jasper Bertisen have filed a lawsuit against the Travelers Home and Marine Insurance Company. And that is why you're here for your deposition today. I will be referring to the Travelers Home and Marine Insurance Company as Travelers throughout this deposition. Do you understand that when I say, "Travelers," I mean the Travelers Home and Marine Insurance Company?



A Yes.
Q Thank you. And please tell us your full name and spell your last name for the record.
A Linda Marie McGowan, M-C-G-O-W-A-N.
Q Thank you. Are you represented by an attorney today?
A No.
Q Okay. And, Ms. McGowan, have you been deposed before?
A Yes.
Q Approximately, how many times?
A Probably, 20 times.
Q When was your most recent deposition?
A In 2019.
Q Okay. So it's been a couple of years. So I'm just going to go over some of the deposition basics, ground rules, especially given that we are in a Zoom setting. Now, Ms. Jodi Wilson here, our court reporter, is going to be noting down everything that is said. We are -- since this deposition is over Zoom, she may have a hard time hearing what is said, especially if we speak at the same time. So I'm going to try and wait for you to finish responding to my questions before I ask any further questions or ask for clarification. I also ask that you wait for me to completely finish asking my



question before you start responding even when you think you know what I'm going to be asking. Is that fair?
A Yes.
Q Also, nodding your head, shaking your head or giving partial responses, like, "Uh-huh, uh-uh," those types of things are not going to come through clearly on the record. So I ask that you use full words in responding to my questions, okay?
A Sure.
Q If you do not understand my question, please ask me to rephrase it. Otherwise, if you respond, I'm going to assume that you understood my question. Is that fair?
A Yes.
Q And if you want to take a break at any time for any reason or even no reason at all, just let me know. You can take a break at any time. I just ask that you not take a break while there's an open question on the table that has not yet been responded to. Okay. So first, I'm just going to ask you a little bit about your background. What is your current occupation?
A I'm a licensed engineer and architect in the state of Colorado. I am more or less retired. But I'm working part time as a consultant for the firm that I previously worked for, which is BC&E LLC. And when I



say, "Part time," it's not quite part time. It's as needed.
Q Okay. And how long have you been with BC&E?
A I was with BC&E since their beginning in 2005.
Q And how long have you held your licenses that you've just discussed?
A I received my professional engineering license in Colorado in 1994 and my architecture license in Colorado in 2000.
Q And you previously mentioned that you've been deposed around 20 times. Were those depositions somehow related to your position at BC&E?
A Yes.
Q Every single one?
A Either with BC&E or my previous employer, which is Wiss Janney Elstner Associates.
Q Were the other matters in which you've been deposed, did they involve insurance carriers?
A Some of them.
Q Were they pertaining to property damage claim due to weather-related losses?
A One of those was. Yes.
Q And when was the one that was pertaining to a property damage loss?
A I'm just going to look at my CV so I can kind

of remember. That was --
Q Well, hey. I can share my screen with you and pull up your CV because that was the next thing I was going to do.
A Okay.
Q If I can figure out how to do it. Let's see here. Okay. Do you recognize the document that's on your screen?
A Yes. That is my professional qualification statement.
Q And for the record, this system previously Bates stamped with Travelers_0000964. Did you prepare this document?
A That looks like it's dated from when I was still a principal at BC&E LLC. And yeah. More or less, I prepared it.
Q okay. And for the record, I'm going to have this labeled as Exhibit 1. And I believe you were in the midst of referring to your resume in order to respond to my question about a previous deposition that had to do with property damage on an insurance claim. Do you need me to have the court reporter repeat the question?
(EXHIBIT 1 MARKED FOR IDENTIFICATION)
A That is not what I was -- that document is not



what I was referring to.
Q Oh. Okay. Sorry about that. I misunderstood then. Which -- would you send me a copy of whatever document it is you're pulling up on your screen to refer to at the conclusion of this deposition, please?
A Yes.
Q Okay.
A And do -- should I send one to Brian as well?
MR. DEVILLING: Please do.
Q Sure. Yeah.
A Do you want me to send it now?
MS. GOODRICH: Yeah. That's fine.
MR. DEVILLING: It might short circuit some questioning.
A Share, e-mail, send. Katie and Brian. Do you want me to -- I don't know if I have Rodney's e-mail. Do you want me to send it to the court reporter as well? Or will you forward it on?
BY MS. GOODRICH:
Q Actually, if you want, yeah. I can forward it on. You can just --
A Okay. I sent it just to Katie and to Brian.
MR. DEVILLING: Thank you.
Q Okay. Thank you. Okay. Thank you for sending that. Now, Ms. Wilson, could I have you repeat



the question that I had asked before I pulled up my document introduced as an exhibit, please?
COURT REPORTER: I may not have the exact question.
MS. GOODRICH: You're on mute.
COURT REPORTER: Oh. Sorry. I apologize. I have two mics. I may not have the exact question. I was writing down the exhibits. I'm going to pull up the last question I have. Every time you talk, I push "Queue." I don't know if it's going to be the exact one. But let me see what I have, okay?
(REPORTER PLAYS BACK REQUESTED TESTIMONY)
MS. GOODRICH: Yeah. It was before.
COURT REPORTER: It was before that?
MS. GOODRICH: I can just try to restate it.
COURT REPORTER: Hold on. Let me -- you want me to try the last one before that?
MS. GOODRICH: Sure.
COURT REPORTER: Okay. Sorry about that
(REPORTER PLAYS BACK REQUESTED TESTIMONY)
MS. GOODRICH: Yeah. Before that.
(REPORTER PLAYS BACK REQUESTED TESTIMONY)
COURT REPORTER: I am so sorry.
(REPORTER PLAYS BACK REQUESTED TESTIMONY)
MS. GOODRICH: Yeah.



COURT REPORTER: That one?
MS. GOODRICH: Yeah.
COURT REPORTER: Do you want me to play it again?
BY MS. GOODRICH:
Q Ms. McGowan, did you catch that?
A I think you had asked, when was the last time I was in deposition? Is that the right question?
Q Not quite. I'll just restate it. So I had asked when the last time you were in deposition pertaining to an insurance claim involving property damage loss.
A I understand. That would be February 20, 2019.
Q And do you recall who the insurance carrier was involved in that lawsuit?
A Travelers Indemnity Company of America.
Q Do you recall who the lawyers were who represented Travelers?
A I do not.
Q Do you recall the issue presented or the reason for your deposition in that lawsuit?
A That was a hail claim on a commercial property in Parker, Colorado.
Q And did you serve as an umpire or as an

appraiser in that lawsuit?
A I served as an umpire.
Q Do you recall if the Travelers entity in that matter paid out on any appraisal award that was issued?
A I don't recall.
Q Do you recall any other details regarding that lawsuit?
A It was a commercial property. There was a large commercial building with a membrane roof over the majority of that building. And then it was -- there were two other buildings that were sort of all part of a little strip mall. And there were wood shakes and membrane roofing on those two buildings.
Q Okay. Well, thanks for those details. Now I'm going to switch back to the document that was previously marked as Exhibit 1. It should still be up on your screen. So this is a correct copy of your resume, correct?
A Well, this was when I was still employed with BC&E as a principal. So I was a partial business owner in BC&E LLC. I sold my shares in the company in 2000 and gave up being principal. I am just now working part-time, hourly basis as a consultant. So there's some facts on here that are not exactly correct in terms of what my title is.



Q Okay. So it's not necessarily a current copy of your resume.
A That's right.
Q But it is an accurate copy of your resume at some point in time.
A Yes.
Q Have you participated in appraisals -- how many times have you participated in appraisals in the past?
A I am not an appraiser. And I've never done a insurance appraisal.
Q So this was your first insurance appraisal?
A I was not an appraiser. And I've never done an insurance appraisal. I was hired as an umpire.
Q How many times have you participated as an umpire in an insurance appraisal before?
A Three or maybe four times. Probably, just three, I think. That's all I can really clearly remember.
Q Okay. Before this deposition, did you review any documents or voicemails or anything to prepare?
A I brought the file from the office. And I gave it a quick run through, probably about 20 minutes, just looking at some of the correspondence back and forth, my report.



Q And did you speak with anyone in preparing for this deposition?
A I did not.
Q Okay. Now I'm going to speak -- I'm going to ask you questions about hail damage to roofs generally. Prior to the Bertisens' insurance claim, had you ever evaluated a tile roof for hail damage in any capacity before?
A I have not looked at a concrete tiled roof system for hail damage. No.
Q And in general, I guess based on your credentials, what would you look for in order to determine whether hail damaged a tile roof?
A In general, I would be looking at certainly cracks, tile that has become dislodged or displaced. In some cases, I might be looking at the surface condition of the tile depending on if there appeared to be any changes to the surface from hail impact as well as hail impact on adjacent portions of the roof, vents through the roof, metal components that are part of the roof assembly, roofing flashing, to look at where there might be some signs of hail impact.
Q So all of the things that you mentioned in order to assess whether they're present on a roof, how would you make that determination? Is it a visual



inspection? Would you conduct intrusive testing? Can you describe your methodology, please?
A For the scope of this particular project, it was visual only.
Q And do you think to see the types of things that you say you were looking for, do you need to make a -- do you need to be an engineer in order to witness those conditions?
MR. DEVILLING: Object to form.
A I don't believe so.
Q Okay. Now I'm going to speak with you about the Bertisens' claim specifically. I'm going to pull up another document on your screen. So for the record, this document was previously Bates stamped Travelers_001057 through 1059. Now, do you -- I have the page that starts 001057 about halfway down up on the screen. Do you recognize this e-mail?
A You know, it's been a long time since I've looked at any e-mails for this. So I couldn't say for sure. But it just looks like an e-mail that somebody sent me with documents that were provided by Travelers or by the appraiser working for the Bertisens.
Q Okay. But you -- it sounds as though you maybe don't remember receiving this e-mail?
A You know, there's a lot of e-mails. I'm

assuming that I looked at it. But I don't know. I mean --

**Q Do you have any position on whether this is an accurate list of documents that you received in doing your own private services on this claim?**

A Could you scroll up a little bit? And let me see what this is. If there was some way --

**Q Yeah. And for all of these electronic screen-shared exhibits, just tell me to move around however you need in order to view the document completely.**

A I don't have a copy of it. But it looks like something I would have read. That's probably the best I can tell you. The list of all the documents that were uploaded to a file sharing site by different parties. So everybody had the benefit of looking at these. And this looks pretty complete.

COURT REPORTER: Ms. Goodrich.

MS. GOODRICH: Yes.

COURT REPORTER: Are we marking this as Exhibit 2?

MS. GOODRICH: Yes, please.

(EXHIBIT 2 MARKED FOR IDENTIFICATION)

COURT REPORTER: Okay. Thank you.

BY MS. GOODRICH:



**Q Okay. Now I'm going to show you another document. This document was previously Bates stamped Travelers_000281 to 282. And so Ms. McGowan, have you seen this letter before?**

A I'm just going through my files to see if I see something that looks like that. That doesn't really look familiar to me. So I would say I don't remember seeing it. It doesn't look like something I've seen before.

**Q Okay. Thank you. And that will be Exhibit 3.**

(EXHIBIT 3 MARKED FOR IDENTIFICATION)

COURT REPORTER: Thank you.

**Q Okay. I'm moving on to another document. So this document was previously Bates stamped Travelers_001082 through 001085. Ms. McGowan, do you recognize this e-mail and its attachments?**

A Yeah. That looks like an e-mail that I sent that included my -- the summary letter and a table that I generated to help me understand what somebody's claiming here or what another person is claiming. So it was just sort of, my own little analysis of different claims.

**Q Okay. And did -- so this will be marked as Exhibit 4. Did you prepare -- did you draft this e-mail?**



(EXHIBIT 4 MARKED FOR IDENTIFICATION)

A Yes.

**Q And did you draft this summary that was attached to the e-mail?**

A Yes.

**Q And you stated before that you drafted this table as well, correct?**

A What's the date on that, 09-03-2020? Yeah. I don't have a copy of it in my -- oh, yes I do. Yes. I have a copy. It's very small. (Sound effect)

**Q Sorry.**

A Yes. I have that. And I did draft that.

**Q Okay. So looking at the summary at page 1083, I note that there are two claim numbers listed here. Were there two claims evaluated?**

A You know, I had some difficulty kind of trying to identify what goes with what. So I just put all the numbers that I understood were somehow related to this on there. So I don't really know if any of those are erroneous or don't apply. Those are just the numbers that were -- had previously been made known to me.

**Q Did you have any understanding of what the different numbers symbolized?**

A Not really.

**Q Okay. Generally, if you were evaluating**



**whether a roof was damaged by hail, would it impact your evaluation if you knew that there were interior leaks at the property?**

A I think I was aware of that. I think that was information given to me anecdotally. But I didn't really have any specific information. My recollection is I was told that there was interior damage and it was handled separately and that it was actually fixed. My recollection is it was fixed by the time I even visited the site.

**Q Do you recall how you gained that awareness, who may have had that conversation with you?**

A It was one of the appraisers. I don't know which one or both of them. But it was conversational that way.

**Q Okay. So in the letter, it states, "We visited the site on August 9, 2020, to observe existing conditions." Did you visit the property address listed in this letter on August 9?**

A Yes.

**Q Was anyone with you?**

A The two appraisers were with me.

**Q Anyone else?**

A Not that I can recall. No.

**Q And why did you visit the property?**

Page 22

A I wanted to see firsthand what the conditions were on the roof and around the outside of the building. And I think we actually went inside and looked at the windows from portions of the interior.

**Q And generally, what did you see when you visited the property?**

A There -- the roof had no work since before the hailstorm. And the exterior walls -- I also think the exterior walls and the windows had -- I don't think any work had been done to those. We -- there was a balcony on the back of the house, which is on the south elevation. We went inside to look at that balcony on the surface and below, and I -- I can't remember if there had been work done to the balcony, but I think that -- that -- my recollection is that in the dining room, there was some work done to either the ceiling or the walls, which would be the ceiling -- the -- the dining room is at the sort of the southwest corner of the house, and I think they said maybe there was some work that was done. It was -- it was finished in good condition when I was there, so I think they said maybe there was some work done inside there.

**Q Okay. And you said that work was not done yet on the -- to the roof? Or did -- and did you say that roof was also -- or work was not done on the windows as well?**

A As far as I know, no work was done on the roof or the exterior walls or the windows that are discussed -- that they're part of what I looked at. There may have been some other windows that were addressed that are -- are -- I have not talked about, but I -- I don't really remember. Those were in the dining room, three small windows on the west side.

**Q Okay. Could you see -- could you see any sort of damage to those components of the property?**

A From the outside, yes.

**Q Did you go on the roof?**

A Yes.

**Q And what did you see on the roof?**

A There was quite a bit of cracking of the tiles in various locations, more so probably on the south side. There were some cracks in the tiles that had been previously repaired with caulk, for lack of -- yeah, for -- with some kind of caulk material, and there were tiles that -- where portions of the tile had been cracked and were dislodged at various locations.

**Q And based on what you saw, did you think the roof was damaged by hail?**

A I do.

**Q Did you discuss your thoughts with the other appraisers?**

A Yes.

**Q Did Tony Trujillo agree that the roof was damaged by hail?**

A Yes, I believe he did.

**Q Did Seth McClure agree that the roof was damaged by hail?**

A I believe he did as well.

**Q Did you discuss on what date you felt the hailstorm had damaged the roof?**

MR. DEVILLING: Object to form. Go ahead.

A I -- I don't remember if we distinctly talked about the date of the most recent hail damage. We did talk that there probably had been some damage. I don't remember if we talked about hail damage, but there had been some damage to the roof prior to the hail event that had -- there were some cracked tiles that had been repaired previously, you know, prior to the -- the event -- this hail event.

**Q So do you recall if you ever discussed whether the roof was damaged by hail on May 8, 2017?**

A I don't -- I don't remember specifically if we said, "This here was caused by -- by hail right here.", but we talked about in general, damage to the roof that would've been caused by hail, the cracked tiles and so forth.

**Q Okay. And then in this summary letter that should still be up on your screen, page 1083, it says, "Date of loss, May 8, 2017.", correct?**

A Yes.

**Q Do you remember hearing from either of the appraisers that they disagreed with that date of loss?**

A No. I don't -- I don't have any recollection of anyone mentioning that it was any date other than that.

**Q Okay. Thank you. Now, looking at this document, I would like to call attention to paragraph A at the bottom of the page. I'm just going to read it. "It is our opinion that the entirety of the tile roofing should be removed and replaced. We do not believe it reasonably possible to remove and replace only some of the tiles or to remove some areas of the tiles, such as the south facing side only without compromising the aesthetics of the roofing -- the roofing." Did I read that correctly?**

A Yes.

**Q Now, I just want to unpack this paragraph a little bit. You refer to, "we", in this paragraph. Who is "we"?**

A "We" would be myself and the company, BC&E.

Page 62

**replacement yourself?**
A Yes. Well, I have designed roof replacement projects, but I haven't actually been a roofer.
**Q Okay. Got it. All right. So as an architect and an engineer, you've designed roofs and roofing systems, but you've never actually done the installation, fair to say?**
A Yes.
MR. DEVILLING: Okay. Those are all the questions I have. Thank you very much for your time.

REDIRECT EXAMINATION

BY MS. GOODRICH:
**Q And I just have a follow up question. So you responded to one of Mr. Devilling's questions earlier by saying that the appraisal award addressed all damage on the roof, even non-hail damaged tiles. Is that because there were sufficient hail damage tiles to warrant the full roof replacement regardless?**
A No. That would be accurate if -- there are other factors that go into the full removal and replacement. Trying to match it, trying to get that to look good, to have an idea of the quality of the tile that's going in there. So it's a -- it's about addressing the entirety of the damage that's up there.

Page 63

**Q So -- sorry, I'm trying to think of a way to phrase this. So the appraisal award, you said -- stated earlier, addressed all damage on the roof, even non-hail damage. Without the hail damage that occurred on May 8, 2017, do you think that this roof should have been replaced before that hail?**
MR. DEVILLING: Object to form.
A From what I saw, no.
**Q So because of the May 8, 2017 hail damage, the roof needed to be replaced?**
A Yes.
MR. DEVILLING: Object to form for the last question.
MS. GOODRICH: Okay. No further questions. Thank you.
MR. DEVILLING: I'm all set here. Thanks again for your time.
THE WITNESS: Before we conclude, I just want to follow up. Katie, you had asked for that RCV Xactimate from McClure.
MS. GOODRICH: Yes.
THE WITNESS: And I just e-mailed that to you and Brian.
MS. GOODRICH: Oh, wonderful. Thank you.
COURT REPORTER: A couple -- does anybody else

Page 64

have anything to say, guys?
MR. DEVILLING: No. Thank you.
COURT REPORTER: Okay. Before we get off the record, are there any other stipulations? Are there any stipulations we want to add to this?
MS. GOODRICH: Nope.
COURT REPORTER: Okay. And those exhibits, are you guys going to -- Ms. Goodrich, are you going to e-mail those to me?
MS. GOODRICH: Yes, I can do that. Would you mind -- you have my e-mail address. Could you e-mail me?
COURT REPORTER: Yep.
MS. GOODRICH: And I'll respond.
COURT REPORTER: Yep. I can sure do that. No problem at all. And Ms. Goodrich, how would you like a copy of your orders today?
MS. GOODRICH: Electronically, please.
COURT REPORTER: Absolutely. Mr. Devilling. How about you, sir?
MR. DEVILLING: Electronic with exhibits.
COURT REPORTER: Okay. Got it. I just have a couple spellings, if you guys don't mind. We had Janney Elstner Associates.
THE WITNESS: Oh, no. I'll spell it for you.

Page 65

The first word is Wiss, W-I-S-S.
COURT REPORTER: Oh, I was way off. I am so sorry.
THE WITNESS: The second word is Janney, J-A-N-N-E-Y.
COURT REPORTER: Okay.
THE WITNESS: The third word was Elstner, E-L-S-T-N-E-R, Associates Incorporated.
COURT REPORTER: Okay. So E-L-S-T-N-E-R. Is that right?
THE WITNESS: That's right.
COURT REPORTER: Got it. Thank you so much. And Ms. Goodrich, you had mentioned some other lawyers from the -- Mr. Devilling's firm. Could you just name those for me really quick?
MS. GOODRICH: Yes, I can. Yeah. Sorry about that. Thinking back that --
COURT REPORTER: -- no, that's okay. I looked on the website and there was a ton of lawyers at that firm, so.
MR. DEVILLING: Yeah. So two of them have left. Amy Sandberg, I think you mentioned. And Jonathan Koeheler.
MS. GOODRICH: Yep.
COURT REPORTER: Okay.