Exhibit 9
Plaintiffs' Motion for Partial Summary Judgment

PIKE REPORTING COMPANY

CASE NO. 1:20-cv-03650-NYW-STV

# ANITA BERTISEN AND JASPER BERTISEN

vs

# THE TRAVELERS HOME AND MARINE INSURANCE COMPANY

## DEPOSITION OF:

## ADRIAN FRYXELL, ON BEHALF OF

## THE TRAVELERS HOME AND MARINE INSURANCE COMPANY

## DATE:

## January 20, 2023

PIKE REPORTING COMPANY
YOUR PATH THROUGH LITIGATION

(855) 693-3767 | (720) 738-1300
schedule@yournextdepo.com

www.pikereporting.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
CASE NO. 1:20-cv-03650-NYW-STV

ANITA BERTISEN AND JASPER BERTISEN,
Plaintiffs,

v.

THE TRAVELERS HOME AND MARINE INSURANCE COMPANY,
Defendant.

DEPONENT: ADRIAN FRYXELL, ON BEHALF OF
THE TRAVELERS HOME AND MARINE INSURANCE COMPANY
DATE: JANUARY 20, 2023
REPORTER: CARRIE COX

Page 2

APPEARANCES

ON BEHALF OF THE PLAINTIFFS, ANITA BERTISEN AND JASPER BERTISEN:
Katherine E. Goodrich, Esquire
MoGo LLC
600 17th Street
Suite 2800 South
Denver, Colorado 80202
Telephone No.: (303) 357-1317
E-mail: katie@mogollc.com
(Appeared via videoconference)

ON BEHALF OF THE DEFENDANT, THE TRAVELERS HOME AND MARINE INSURANCE COMPANY:
Brian Devilling, Esquire
Foran Glennon Palandech Ponzi & Rudloff PC
222 North La Salle Street
Suite 1400
Chicago, Illinois 60601
Telephone No.: (312) 863-5018
E-mail: bdevilling@fgppr.com
(Appeared via videoconference)

Page 3

INDEX

| | Page |
|---|---|
| PROCEEDINGS | 6 |
| DIRECT EXAMINATION BY MS. GOODRICH | 7 |
| CROSS EXAMINATION BY MR. DEVILLING | 130 |
| REDIRECT EXAMINATION BY MS. GOODRICH | 134 |
| CONFIDENTIAL PORTION I REDACTED | 108 |
| CONFIDENTIAL PORTION II REDACTED | 109 |

EXHIBITS

| Exhibit | Page |
|---|---|
| 3 - Travelers response letter, dated December 14, 2020, also identified as Lechtenberg, Bates Bertisen_001157-001159 | 96 |
| 6 - Notice of Deposition | 9 |
| 7 - Bertisen Travelers Homeowners Policy, Bates Travelers_000001-000046 | 19 |
| 8 - Claim Log, Bates Travelers_000047-001317 | 20 |
| 9 - Traveler's file notes, Bates Travelers_001318-001604 | 48 |
| 10 - Bertisen Appraisal Response by Linda McGowan, Bates Bertisen_000825-000826 | 89 |
| 11 - Building Damage Estimating Guidelines (MARKED IN CONFIDENTIAL PORTION) | |

Page 4

EXHIBITS (CONTINUED)

| Exhibit | Page |
|---|---|
| 12 - McGowan Deposition (MARKED IN CONFIDENTIAL PORTION) | |
| 13 - Letter with Depreciation payment, Bates Bertisen_001160 | 110 |
| 14 - Post lit notes redacted | 113 |
| 15 - Defendant's First Amended Answers to Plaintiff's Interrogatories and Requests for Production | 115 |
| 16 - Screenshot www.CustomTileRoofing.com for Westile Series 1000* | 133 |

*Will forward upon receipt.

Page 5

STIPULATION

The 30(b)(6) deposition of ADRIAN FRYXELL was taken at PIKE REPORTING COMPANY, 410 17th STREET, SUITE 1350, DENVER, COLORADO 80202, via videoconference in which all participants attended remotely, on FRIDAY, the 23rd day of JANUARY 2023 at 8:58 a.m. MT; said deposition was taken pursuant to the FEDERAL Rules of Civil Procedure. This notarial act involved the use of communication technology pursuant to 8CCR 1505-11.

It is agreed that CARRIE COX, being a Notary Public and Court Reporter for the State of COLORADO, may swear the witness and that the reading and signing of the completed transcript by the witness is not waived.

PROCEEDINGS

COURT REPORTER: We are now on the record. Will all parties, except for the witness, please state your appearance, how you are attending, and the location you're attending from, starting with plaintiffs' counsel.

MS. GOODRICH: Hi. I'm Katherine Goodrich. I'm appearing on behalf of the Bertisens, from Granby, Colorado on Zoom.

MR. DEVILLING: Brian Devilling, on behalf of Travelers, appearing on Zoom, from Chicago.

COURT REPORTER: Great. Does counsel stipulate their consent to this manner of deposition and their waiver of any objection to this manner of deposition, including any objection to the admissibility at trial of this testimony based on this manner of deposition?

MS. GOODRICH: Yes.

MR. DEVILLING: Yes, we stipulate.

COURT REPORTER: Thank you. Mr. Fryxell, will you please state your full name for the record and hold your ID up to the camera?

THE WITNESS: Adrian Christopher Fryxell. Is that good, or --



COURT REPORTER: You might need -- yeah, you might need to unblur your background for a moment so we can view that. Need to back it up a little bit. Maybe a little bit more. Does counsel agree you can see it?

MR. DEVILLING: Yeah.

COURT REPORTER: Very good. Thank you. Mr. Fryxell -- do all parties agree that the witness is, in fact, Adrian Fryxell?

MS. GOODRICH: Yes.

MR. DEVILLING: Yes.

COURT REPORTER: Thank you. Mr. Fryxell, will you please raise your right hand? Do you solemnly swear or affirm that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

COURT REPORTER: Okay. Thank you. You may begin.

DIRECT EXAMINATION

BY MS. GOODRICH:

**Q Morning, Mr. Fryxell. My name is Katie Goodrich. I'm one of the attorneys representing the Bertisens in a lawsuit filed against the Travelers Home and Marine Insurance Company related to a May 8, 2017**



**hail storm. So thank you for coming today. Could you please tell me what your current title is?**

A Unit manager.

**Q Unit manager. And where do you work?**

A Denver, Colorado.

**Q Who do you work for?**

A Travelers Insurance.

**Q Do you understand that you are here today to testify as a designated representative of the Travelers Home and Marine Insurance Company?**

A I do.

**Q Do you understand that when I say "Travelers," I mean the Travelers Home and Marine Insurance Company for purposes of this deposition?**

A I do.

**Q Do you recognize this document? I'm going to -- so during this deposition, I'm going to be sharing my screen to show you exhibits that will be exhibits to this deposition. It can feel kind of artificial because it's over Zoom. But please let me know if you want me to stop at a certain page so that you can spend more time reading it in order to identify the document or understand what it is saying. Otherwise, I will just point you to where I'm trying to go. But please let me know if you need me to stop anywhere. So I'm going to**



**share my screen and pull up our first exhibit. And I'm going off of the numeration from the first part of the 30(b)(6). So we're starting with Exhibit 6. Do you recognize this document?**

(EXHIBIT 6 MARKED FOR IDENTIFICATION)

A Yes.

**Q And you're here in response to this document?**

A Yes.

**Q Can you describe in your own words what this document is?**

A If you can scroll back up to the top, please, to the -- it's the lawsuit filed by the Bertisens against Travelers.

**Q What does the title say?**

A The notice for the deposition.

**Q Okay. So yes, this is the Notice of the Deposition.**

MS. GOODRICH: And I'm going to have it marked as Exhibit 6.

**Q So you're here as a corporate representative of Travelers, correct?**

A Correct.

**Q And are you here to testify as to the non-highlighted portions of this Exhibit 1 to the deposition notice?**

file," correct?
A Correct.
Q What is that stance that's being referred to here?
A That there was no hail-related damages to the tile roof system of this or Ms. Bertisen.
Q States, "Please just communicate this with the insured, that no additional supplements will be issued, and proceed with closing the file," correct?
A Correct.
Q Were there any other inspections before the claim went to appraisal?
A No.
Q After this entry, was the claim closed?
A If you can scroll down, I believe it'll indicate if it was closed. I don't see that specifically in there. There -- it might be located in the milestones. But if you're looking at the dates, it -- it goes, you know, the appraisal demand was received in August of 2018. And that note from Eric would've been several months before, two months before, I think, roughly. So I would assume that the claim would've been closed down from June until the appraisal was received, and then the claim would've been reopened.
Q Okay. I'm going to go back up to those



milestones just so that we can look at whether the claim was closed.
A Yep. So it was closed on June 18, 2018, and then it was reopened on August 22, 2018 when the appraisal demand was received.
Q For the record, we're looking at the page Bates labeled Travelers_00051, still on Exhibit 8. So no roofing tiles were paid for before the claim was closed, correct?
A Correct.
Q Okay. I'm going to flip to Exhibit 7, the insurance policy that was in effect on the date of loss, specifically at the Appraisal Provision that's on page 24, Travelers_000024. So the Appraisal Provision states, "If you and we fail to agree on the amount of loss, either may demand an appraisal of the loss. In this event, each party will choose a competent and impartial appraiser within 20 days after receiving a written request from the other. The two appraisers will choose an umpire. If they cannot agree on an umpire within 20" -- "15 days, you or we may request that the choice be made by a judge of a court of record in the state where the resident's premises is located. The appraisers will separately set the amount of loss. If the appraisers submit a written report of an agreement



to us, the amount agreed upon will be the final amount. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will set the amount of loss. Each party will pay its own appraiser and bear the other expenses of the appraisal and umpire equally." Did I read that mostly correctly?
A Yes.
Q Do you see anywhere in this appraisal provision where it states that the appraisal panel cannot determine causation?
MR. DEVILLING: Object to form.
A It specifically states the amount of the loss. I don't see anything where it notes causation within that language.
Q So it states, "A decision agreed to by any two will set the amount of loss," correct?
A Correct.
Q Are appraisal awards typically binding?
MR. DEVILLING: Object to form.
A Yes.
Q When would an appraisal award not be binding?
MR. DEVILLING: Object to form.
A When they go outside of the scope of the language listed in the policy, the appraisal language.



Q Looking at the loss payment clause directly above the appraisal provision, it states, "Loss will be payable 60 days after we receive your proof of loss and reach an agreement with you, there is an entry of final judgment, or there's a filing of an appraisal award with us," correct?
A Correct.
Q I'm switching back to Exhibit 8. Travelers testified in the first half of this 30(b)(6) deposition that it sometimes uses form letters and sometimes uses freeform letters. Can you tell me whether this is a form letter or a freeform letter?
A It says in the bottom left corner, "freeform."
Q Does that mean that it's not a form letter?
A Correct.
Q So is this a letter that Nicholas Kern drafted himself?
A Yes. But any freeform letter is typically required to have a manager approve -- review and approve.
Q Okay. And for the record, we were looking at the letter that's on pages Bates labeled Travelers_000281 to 282. What's the date on this letter?
A 9-6-2018 -- September 6, 2018.

Page 70

Q And it's from Travelers to the Bertisens, correct?
A Correct.
Q Could you please read the second paragraph out loud?
A "Travelers disagrees that hail physically damaged the roof tiles at your home. Appraisal's appropriate with the respect to property components over which the two parties disagree as to the amount of the loss, but not with respect to those components over which we disagree as to the coverage and/or causation. Travelers is amenable to conducting an appraisal in which the panel sets the amount of the loss for both the disputed and undisputed damages, with Travelers reserving the right to challenge issues of coverage and causation. This approach is consistent with the terms of the policy's appraisal provision and allows the parties to reserve all rights to the extent permittable" -- "permitted by Colorado law."
Q What are the disputed damages?
A I believe it -- it indicated to that first sentence that it's the roof tiles.
Q What are the undisputed damages?
A The other hail-related damages to the property.

Page 71

Q And this letter in the paragraph you just discussed talks about coverage and causation. Can you tell me your understanding of the difference between "coverage" and "causation"?
MR. DEVILLING: Object to form.
A So "coverage" would be if the policy outlines anything that specifically is excluded or not covered under the policy. "Causation" would be, you know, what -- what caused the damage: Was it hail-related, or was it a defect within the -- the item itself?
Q How does Travelers interpret the phrase "amount of loss"?
MR. DEVILLING: Object to form. Go ahead.
A The amounts of the damage to the property as a result of covered cause of loss.
MR. DEVILLING: And let me just add to that objection, I think it's beyond the scope of the 30(b)(6). So I'll just leave it at that. Go ahead.
BY MS. GOODRICH:
Q Okay. And then on the next page here, page 282 of the same letter, it states, "All coverage and causation defenses to the disputed damages are observed for future resolution, and no waiver or estoppel will be implied from this agreement." Did I read that correctly?

Page 72

A Correct.
Q Did an attorney review this letter?
A I do not know.
Q Based on the contents of this letter, my understanding is that Travelers agreed to go to appraisal, but was reserving its right to challenge as to coverage or causation; is that correct?
A That is correct.
Q Okay. So this letter is Travelers responding to the Bertisens' demand for appraisal, correct?
A Correct.
Q So it was the Bertisens that demanded appraisal?
A Without looking at -- specifically at the appraisal letter and who signed it, but typically, it's the insured or a contractor that might have an assignment of benefits that would invoke this. But I believe, again, that it would've been Mr. or Ms. Bertisen that would invoke the appraisal language -- or the appraisal demand.
Q So what I'm asking is, it wasn't Travelers who invoked appraisal, correct?
A Correct.
Q Who was Travelers' appraiser?
A Wayne D. Sowers, initially.

Page 73

Q Who ultimately completed the appraisal for Travelers?
A Seth McClure.
Q Have you ever worked with Seth McClure?
A Yes.
Q How many times?
A I -- I wouldn't know the exact number.
Q More than ten?
A More probable that it's more than ten, yes.
Q More than 20?
A No.
Q Did you work with him while you were at Travelers?
A Yes.
Q What is your opinion of Seth McClure?
A He's an appraiser that we've engaged with. You know, I -- I don't know specifically outside of, you know, seems to have a -- a professional demeanor, seems to understand what he's doing and know what he's doing as an appraiser. Outside of that (clears throat) -- excuse me -- outside of that, the -- there's not much interaction or understanding of -- of his work product.
Q Do you think that Seth McClure is competent as an appraiser?
A Yes.

Page 74

Q Do you think that Seth McClure would have any biases as an appraiser working on behalf of Travelers?
A No.
MR. DEVILLING: Object to form.
Q So Travelers does not consider its appraiser to be biased or incompetent, correct?
A Correct.
Q Did Travelers receive this e-mail on the page Bates labeled Travelers_000604 in Exhibit 8?
A Yes.
Q Can you just take a minute to read that and let me know when you're done?
A Okay.
Q Based on this e-mail, would you agree that Mr. McClure concluded that there were 29 concrete tiles on the roof that were damaged by hail?
MR. DEVILLING: Form.
A That he would be writing up in his appraisal that -- to replace 29 tiles.
Q Because they were damaged by hail, correct?
A It indicated that it could be attributed to hail in the -- in the e-mail.
Q He references here a J.S. Held report, correct?
A Correct.

Page 75

Q Did Mr. McClure engage J.S. Held?
A Yes.
Q Is J.S. Held an engineering firm?
A Yes, it is.
Q So my understanding of this e-mail is that the engineering firm engaged by Mr. McClure concluded that there was hail damage to 29 of the concrete tiles on the roof; is that correct?
A That they could be attributed to hail, yes.
Q What's the difference between "can be attributed to hail" or "caused by hail"?
A I mean, I would like to review the report to get a clear understanding of -- of exactly what Jeff put into his report.
Q Did you read the report before this deposition?
A Yes.
Q Do you remember its contents?
A Yes. But I -- I -- if -- if we want to speak to what specifically Jeff is referencing and -- and what Seth is referencing through Jeff and J.S. Held, I'd prefer to look at the report specifically to answer any of those questions.
Q Okay. What is your recollection of the contents of the report?

Page 76

A That there were issues with the roof -- with the tile roof, that the right corner cracks appeared to be fresh and/or newer, based on the photos completed and the on-site inspection completed by Jeff. And that's what he used for his basis to attribute those to hail. There was no identifying impact marks or any other damages. It was just that they appeared fresh so he could attribute them to hail.
Q Does Travelers, to your knowledge, often engage J.S. Held?
A I don't know if I'd say "often," but we do engage with J.S. Held, yes.
MS. GOODRICH: Okay. Could we take a break until 10:00 -- or, 11:10?
MR. DEVILLING: Sounds good to me. Okay. Do you -- just for logistical purposes, do you have a sense of how much more you have?
MS. GOODRICH: I'm about -- well, I'm about halfway through.
MR. DEVILLING: Okay. Cool. All right. See you in a few minutes.
COURT REPORTER: Okay. We'll go ahead and go off the record. The current time is 10:57 a.m. Mountain.
(OFF THE RECORD)

Page 77

COURT REPORTER: We are back on the record. The current time is 11:11 a.m. You may continue.
BY MS. GOODRICH:
Q Thank you. So before we took a break, we were talking about the J.S. Held report conducted for Seth McClure during the Bertisens' appraisal, correct?
A Correct.
Q I pulled up on my screen Exhibit 8, the claim log, pages Bates labeled starting Travelers_000399. Is this the J.S. Held report that you're referencing?
A Yes, it is.
Q Can you read the scope out loud, please?
A "This property evaluation was performed to identify whether the concrete tile roof covering and the EIFS wall cladding was damaged by hail stones on May 8, 2017."
Q Do you know what "EIFS wall cladding" is?
A Stucco -- a stucco system.
Q So in the section titled, "Executive Summary," I see that J.S. Held concluded that hail stones up to approximately one-and-a-half inches in diameter fell at the property on May 8, 2017; is that correct?
A Correct.
Q J.S. Held also indicated that the roofing tiles on the roof are no longer manufactured, correct?

Page 78

A Correct.
Q And point number 7 states that, "Based on our survey of the fractured faces of cracked tiles, we estimate approximately 30 percent of the fractures were created on the date of loss, and approximately 20 percent were previously cracked and became loose on the date of loss"; is that correct?
A Correct.
Q So would you say that J.S. Held concluded that at least some of the roofing tiles were damaged on May 8, 2017, by hail?
A That's what J.S. Held concluded, yes.
Q And we were talking earlier about what Mr. McClure thought in relation to the J.S. Held report. Did Mr. McClure agree that the roof was damaged by hail, at least in part based on the J.S. Held report?
A I believe he included that in his appraisal estimate. I don't know if there's anything specifically that outlines that he was in agreement.
Q I just put up a -- oops, sorry, I opened something by accident -- I just pulled up a different document in the same Exhibit 8, Bates labeled Travelers_001094. Can you tell me what this document is?
A It's the appraisal award.

Page 79

Q What does the appraisal award indicate the date of loss was?
A It was -- initially is 8-1, but it looks like it was crossed out and it has May 8, 2017.
Q Is this appraisal award signed?
A Yes.
Q Can you tell who it was signed by?
A Mr. and Ms. Bertisens' appraiser, Tony Trujillo, and the umpire, Linda McGowan.
Q And what does it state the replacement cost value of the appraisal award is?
A 157 -- sorry -- $157,141.19.
Q And the actual cash value?
A 136,297.85.
Q Did Mr. McClure sign this award?
A He did not.
Q But two members of the appraisal panel did sign the award, correct?
A Correct.
Q Does Travelers doubt the veracity of the signatures?
A Not to my knowledge.
Q Does Travelers think that the umpire was biased or incompetent?
A Not to my knowledge.

Page 80

Q Does Travelers consider this appraisal award to be binding?
MR. DEVILLING: Object to form.
A There's two signed appraisers on it. There's two people that had signed it: The appraiser and the umpire. So that's what the award was set off, based off of the appraisal.
Q So Travelers had 60 days after the last signature date to pay the appraisal award, correct?
MR. DEVILLING: Form.
A If we're going back to --
COURT REPORTER: I'm sorry, is that an objection, Mr. Devilling?
MR. DEVILLING: Yes, sorry. Objection to form.
COURT REPORTER: Thank you.
A Based on the previously reviewed policy language, yes.
BY MS. GOODRICH:
Q Did Travelers pay the full value of the actual cash value of the appraisal award within 60 days?
MR. DEVILLING: Object to form.
A I believe they did not -- we did not.
Q Can you explain to me Travelers' position of why it did not pay the full value of the actual cash value of the appraisal award after the appraisal award

Page 81

was issued?
A Travelers didn't agree with the appraisal as it was determined that during the appraisal that causation of the damage to the roof tiles was in question. And the appraisal took that into consideration, where the -- the appraisal letter that we previously reviewed from Travelers outlined that Travelers reserved its right to dispute any sort of causation. So that's why that payment wasn't issued within 60 days, because there was a dispute as to the outcome of the appraisal with the focus on the causation of the damage to the tile roof.
Q What was the basis for Travelers' opinion that there was a dispute as to the causation of the damage to the roof?
A I think it was within the appraisal award and -- and what was outlined in the -- the estimate that was agreed upon by Tony Trujillo and Linda McGowan.
Q So this document that we're looking at, we just discussed how it has two signatures. This is the appraisal award, correct?
A Correct. There's typically a corresponding document, helps to outline how they came to that total and what it encompasses.
Q Do you know if there were documents such as

Page 82

what you're referring to here?
A Yeah. There should be an estimate or a -- a -- a sheet that was provided by Linda McGowan to show how she came to that total in her evaluation and -- and come to the total of the $157,000.
**Q Is this the document that you're referring to that discusses how Linda McGowan came to her conclusion outlined in the appraisal award?**
A Yes, it is.
**Q Are there any signatures other than Linda McGowan's on this document?**
A No.
**Q What is the date on this document?**
A September 3, 2020.
**Q Do you see in the last paragraph, before the signature block, how it says, "We would be glad to prepare an award and sign it along with one or both parties at a mutually convenient time"?**
A Yes.
**Q So was this document prepared to -- what you can see by -- based on the documents, it looks to me -- sorry, just scratch that. It looks to me as though this document was prepared approximately one month before the appraisal award was signed. Does that sound right to you?**

Page 83

A Yes.
**Q And in this document, point A on the bottom of the page Bates labeled Travelers_001088, it states, "It is our opinion that the entirety of the tile roofing should be removed and replaced. We do not believe it reasonably possible to remove and replace only some of the tiles or to remove some areas of tiles, such as the south facing side only, without compromising the aesthetics of the roofing." Did I read that correctly?**
A Yes.
**Q Is this the source of Travelers' concern that the appraisal panel included uncovered damages in the appraisal award?**
A I think that's part of it, along with the -- you know, the aesthetics. They're getting into a, you know, cosmetic issue with the roof system.
**Q This document, again, was only signed by Linda McGowan, correct?**
A Correct.
**Q Did Travelers reach out to Linda McGowan after it received the appraisal award and this letter opinion to see what she meant by this statement?**
A I don't know. I would have to look at the file notes in more detail around that date to -- to confirm if Travelers did or did not reach out to Linda.

Page 84

**Q Can you tell, based on this statement in paragraph A, whether the appraisal panel included items that should not have been covered under the policy?**
MR. DEVILLING: Object to form.
A Well, it doesn't specifically outline. It just says the -- the roof system should be removed and replaced. It doesn't give any sort of additional information as to why.
**Q Does the insurance policy require any documents to be produced as a result of an appraisal other than the appraisal award itself?**
A Within the policy language, I don't see that, going off of memory, that it specifically outlines anything that needs to be provided. But it is pretty standard for the appraisal process for estimates and/or additional information to be provided to show how both parties came, or all three parties, or whoever had signed the appraisal award, how they came to their determination as the -- the amount of the loss.
**Q So I do want to ask you some more questions about what Travelers did after it received this letter. Is there anywhere that I can point you to in this Exhibit 8, the claim log, that would help you answer questions like that?**
A Yeah, I mean, if you can go to the file notes

Page 85

around that date that the -- this letter was received and the appraisal award was received, I can certainly evaluate Travelers' responses.
**Q Okay. So for the record, I'm on the page Bates labeled Travelers_000080. So in looking at the notes on this page that are dated from October 19, 2020 through December 14, 2020, does it appear that Travelers contacted the umpire or the appraisers to ask questions about the award?**
A Based on those notes, I don't see where we contacted the umpire or any of the appraisers.
**Q Can you tell me from your memory, are there any other documents that would indicate that Travelers -- what Travelers did to investigate the contents of that letter opinion?**
A Nothing that comes to mind at this moment.
**Q Do you know if Travelers did anything to investigate the contents of the letter opinion?**
A No.
**Q Attached to the letter opinion was the spreadsheet. Have you reviewed this spreadsheet before?**
A Yes.
**Q What's your understanding of what it is?**
A It's the breakdown of how Linda McGowan came to the number that she did within her appraisal award.

Q For the record, we're on the page Bates labeled Travelers_001085, Exhibit 8. So what is this column here?
A That would be Mr. Trujillo's recommendation with the appraisal.
Q Okay. So that was the second column. How about this third column?
A That would be Mr. McClure's recommendation as it relates to the appraisal.
Q And the fourth column?
A Linda McGowan's recommendation.
Q And then looking at the rows, the row that's labeled 11, "Tile Roofing," in the "Bertisen Trujillo" column, there's a line item for $65,590.71. Does that correspond with the "Tile Roofing," "Remove and replace all tile" line item?
A Yes.
Q And so that was on the "Bertisen Trujillo" column. Looking at the "Travelers McClure" column, the non-highlighted $12,614.74 figure, what does that correspond to?
A It looks like it corresponds to "Limited tile removal, remove and replace vents."
Q So it looks to me as though Mr. McClure did include some itemization for replacing some of the tiles



on the Bertisens' roof; is that correct?
A Without looking at his estimate, but that's -- that's what it seems like, yes.
Q Did Travelers make a payment, based on Mr. McClure's $12,614.74, for removing and replacing the tiles?
A No.
Q Did Travelers make any payment for the tiles?
A No.
Q Okay. I'm going to go back up to the claim log, page number 79. So we see here a list of figures on the claim log note dated December 15, 2020. Can you tell me what these numbers signify?
A Yeah, would you be able to zoom in, please?
Q Yes.
A So this is the undisputed amount currently on the appraisal award that was calculated to issue an undisputed amount to Mr. and Ms. Bertisen.
Q So the total that Travelers authorized paying was $63,385.08, correct?
A Correct.
Q See where it says, "This payment is being made with direction from legal as there is still a dispute between two appraisers hired"; is that correct?
A That's what it states, yes.



Q What's your understanding of what the dispute is?
A The fact that the appraisal was used to determine causation, specifically with the roof tiles and the -- the damage.
Q And where it says, "between the two appraisers hired," should that maybe just say, "between the panel"?
A I'm not sure what they were getting at with the note, but it could say, "between the panel."
Q Did Travelers' appraiser agree that the roof was damaged by hail on May 8, 2017?
A Sorry, can you repeat that? I apologize.
Q Did Travelers' appraiser agree that the roof was damaged by hail on May 8, 2017?
A They included a payment in their estimate for the appraisal process for the roof. Without looking at that specific estimate, I couldn't say exactly what it -- what it paid for with the roof.
Q Okay. I would like to pull up that estimate if you'll just bear with me for a few minutes while I find it. Okay. Sorry about that delay there. So I'm going to pull up another document on your screen. So this document, Bates labeled Bertisen_000739 through 751, is this the estimate that Mr. McClure prepared during the appraisal?



A Yes, that's what it looks like it is.
MS. GOODRICH: So I'd like to have this marked as an exhibit. Are -- Carrie, are we on Exhibit 10, or 11?
COURT REPORTER: We'll be on 10. We've got 6 through 9 right now.
(EXHIBIT 10 MARKED FOR IDENTIFICATION)
BY MS. GOODRICH:
Q Okay. So this is Exhibit 10. So line items 19 and 20 on the page labeled Bertisen_000741, is this for replacement of some of the roofing tiles?
A Yes, it has, "Remove tile roofing and install tile roofing."
Q What is the unit price reflected here per tile?
A For the installation, $29.21.
Q Does that include the purchase of the tile itself?
A Yeah, it should -- well, I -- that's just in -- based on my -- it looks like it's just the installation cost.
Q Okay. I'm going to scroll through the exhibit. Just let me know if you see the actual itemization of the price to purchase the tiles.
A Yeah, so it should be their roof. It says,

Page 90

"Tile roof." So that appears to be the actual cost to -- cost for the material and the installation.

**Q Does this look as though it's -- the line items 1 and 2, are those line items that were, like, manually inputted, as far as the pricing, or would this have been automatically generated by the software Xactimate?**

A I believe that those I -- I -- to the best of my knowledge, I think that those were -- would've been manually input, but I'm not 100 percent certain.

**Q I see that there's a note under line items 1 and 2, and says, "Includes for removal and replacement of hail damaged tiles only as identified by Jeff Anderson of J.S. Held"; is that correct?**

A Correct.

**Q So based on this estimate, I'm going to go back to my question from earlier. Did Travelers' appraiser conclude that some of the roofing tiles were damaged by hail on May 8, 2017?**

MR. DEVILLING: Object to form.

A It appears that he included it in his estimate. I don't know if he indicates that there are hail-related damages, but it -- he does have tile roofs -- tile roof tiles included in his estimate.

**Q So would you disagree with my statement that**

Page 91

**Seth McClure agreed that some of the roofing tiles were damaged by hail on May 8, 2017?**

A I don't see where he indicates that he states that they're damaged by hail. I see that he includes it and that he notes that it's based off of -- if you could scroll back down -- the -- the note that input it -- that he input regarding as identified by Jeff Anderson.

**Q So what is your interpretation of that, to the extent that you disagree that he -- that he concluded that some of the roofing tiles were damaged by hail on May 8, 2017?**

A I think he's relying on the report from Jeff Anderson from J.S. Held, and that's why he's inputting in there.

**Q And the report from J.S. Held indicated that some of the roofing tiles were damaged by hail on May 8, 2017, correct?**

A Without going back to the report again, I believe that they indicated that there -- it could likely have been caused. I think there was a -- a determination as to the right corner cracks on those. And those were included because the fractures or the breaks on those right corner cracks appeared to be fresh. So that's why J.S. Held concluded that they

Page 92

potentially could be damaged from hail.

**Q Okay. Let's go back to that report.**

MR. DEVILLING: Well, while you're looking for that, logistically, does it make sense to break for lunch at some point, or plan --

MS. GOODRICH: Yeah, sorry, Brian. You're two hours ahead, right? We can certainly break for lunch if you'd like.

MR. DEVILLING: I -- no need to do it on my account. I've got some snacks here. I just -- Adrian, what's your preference?

THE WITNESS: I'm fine either way.

MR. DEVILLING: Oh. It's up to you, Katie.

MS. GOODRICH: I'm sure I will find that report soon. Sorry, just give me a minute. Actually, Carrie, would you mind looking in the record and just letting me know what Bates number page I said the J.S. Held report was on?

COURT REPORTER: Sure. Give me just a moment.

MS. GOODRICH: Oh, I found it.

COURT REPORTER: Okay.

BY MS. GOODRICH:

**Q Okay. So it -- looking at the page Bates label Travelers_000399, this is that J.S. Held report again, correct?**

Page 93

A Correct.

**Q Okay. So I was asking you whether J.S. Held concluded that at least some of the tiles were damaged on May 8, 2017 by hail. Now, what part of this report would -- do you need to refer to in order to answer that question?**

A If you go down, I think a little bit -- keep going down. I think it's the next page. Oh, that's the -- I think it's below the photos or on the page next after the photos. I think it's right there.

**Q Okay. So we're looking at the page labeled Travelers_000404.**

A So yeah, I -- from -- my understanding with J.S. Held is they're saying that they were newer and bright fractures, that because of that, they're saying they're likely related to hailstone impact marks from the date of loss of May 8, 2017.

**Q So J.S. Held concluded that at least some of the roofing tiles were likely damaged by hail on May 8, 2017, correct?**

A Yeah, because they -- their observation was the -- the cracks were brighter and newer, but they didn't indicate any sort of impact marks to any portion of the roof system from hailstones.

**Q So do you disagree with my statement that**

Page 94

J.S. Held concluded that some of the roofing tiles were likely damaged by hail on May 8, 2017?
A I agree that that's what J.S. Held's report states.
Q And do you disagree that Mr. Seth McClure agreed with J.S. Held's report?
A I don't sure if he agreed with the report, but that's what he put into his appraisal award.
Q Okay. Did Mr. Trujillo agree that the roof was damaged by hail on May 8, 2017?
MR. DEVILLING: Object to form.
A Without reviewing his estimate or any of his, you know, documentation of it, but based on the fact that he had included for a full replacement of the roof as we looked at Ms. McGowan's breakdown earlier, I would assume that he was of the mindset that the entire roof needed to be replaced.
Q Because it was damaged by hail on May 8, 2017?
A Without specifically seeing that he noted that, but all -- all the facts considered that's the date of loss, he's including for a full roof replacement of tile roofs, I would conclude that that's what his assumption -- assuming that's what he would -- that was his conclusion, is that the entire roof needed to be replaced because of hailstones from May 8, 2017.

Page 95

Q Okay. I'm going to flip to Exhibit 3 from the prior 30(b)(6) deposition of Travelers. Do you know what this document is?
A Yes.
Q Can you describe to me what it is?
A It's Travelers' response regarding the disagreement regarding the causation determination that was made by Ms. McGowan and Mr. Trujillo in their appraisal award.
Q So you say it's Travelers' response as to the causation determination in the appraisal. Do I have that right?
A Correct.
Q What do you mean -- what causation determination are you referring to?
A This Travelers' position is still that -- that the tiles were not impacted or damaged from hail on May 8, 2017, but that the appraisal award went beyond the appraisal language in determining the amount of loss. And they determined the causation, and they also factored in a cosmetic or aesthetic issue, as Ms. McGowan noted, in their appraisal award.
Q Okay. Who drafted this letter?
A Counsel.
Q Did anyone at Travelers review it?

Page 96

A I'm not sure. I don't know.
Q Do you know if this letter was supposed to be an accurate statement of Travelers' position regarding its payment of the appraisal award?
A I believe it is.
Q This letter is Travelers saying that it declines to pay the full amount of the appraisal award?
A I believe that the letter is pointing to the fact that the appraisal went beyond the appraisal language that was outlined in the policy and that the portion that Ms. McGowan and Mr. Trujillo noted for the tile roofs was an issue regarding causation and a matching or cosmetic or aesthetic issue, and that that wasn't the avenue for the appraisal.
Q What is Travelers declining to pay from the appraisal award?
A The tile roof.
Q Was there an estimate issued with this letter?
A Not that I'm aware of.
COURT REPORTER: Ms. Goodrich, did you want Exhibit 3 included with this matter, or are you just referencing it?
(EXHIBIT 3 MARKED FOR IDENTIFICATION)
MS. GOODRICH: Oh, I want it re-included.
COURT REPORTER: Okay. Thank you.

Page 97

BY MS. GOODRICH:
Q Looking at the second paragraph on the second page, it states, "Travelers disputes that appraisal can resolve the application of coverage limitations and policy exclusions. Travelers further maintains that the appraisal award includes repair costs that are not covered and excluded under the policy of insurance issued to the insureds. It is Travelers' position that appraisal is not a forum to determine coverage or causation and that" -- "and this issue is currently pending appellate review by the 10th Circuit in the Travelers Indemnity Company versus BonBeck Parker, LLC 20-1192. Even assuming that the appraisal panel here had the authority to make a causation determination -- and Travelers does not concede that it did -- it is clear from Ms. McGowan's letter that no such determination was even made, and that Ms. McGowan and Mr. Trujillo determined that a full roof replacement was necessary for aesthetics, and not because the roof tiles were damaged by hail on May 8, 2017"; is that correct?
A Correct.
Q Okay. So Travelers is indicating that it's denying payment for replacement of the roofing tiles because it does not believe that appraisal is an appropriate forum to determine coverage or causation,

Page 98

correct?
A Correct.
Q On the basis of a case that was an appeal that was pending at the time of this letter, correct?
A Correct.
Q It's saying that even if appraisal was an appropriate forum to determine causation, the panel here did not assess causation; is that correct?
A Correct.
Q What is that based on, to your understanding?
A Sorry, can you -- I'm not sure I understand the question there.
Q Sure. I'll rephrase it. So it says here, "It is clear from Ms. McGowan's letter that no such determination was even made." That's referring to Travelers' position that the appraisal panel did not determine causation, right?
A Correct.
Q Based on the letter dated in September, a month before the appraisal award was signed, that's signed only by Linda McGowan, correct?
A Correct.
Q Does Travelers consider the letter opinion issued in September before the appraisal award signed only by Linda McGowan to be binding?

Page 99

MR. DEVILLING: Objection --
A No.
Q Does Travelers consider the letter signed only by Ms. McGowan in September before the appraisal award to be a part of the appraisal award?
MR. DEVILLING: Form.
A Yes, because it outlines how she came to her overall determination under the amount of the loss.
Q But that letter was not signed by any other member of the panel, correct?
A Correct.
Q What's Travelers' understanding of what the umpire meant by "aesthetics"?
A A matching issue with the roof system -- or with the roof tiles.
Q "A matching issue with the roof tiles." What does that mean?
A I believe in a further letter that Ms. McGowan provided later on, that she outlines her thought process with regards to the Westile roof and them not being available for repair as an option.
Q Are aesthetics excluded under the policy?
MR. DEVILLING: Object to form.
A The policy owes for direct physical damage.
Q Has Travelers approved any payment of removal

Page 100

and replacement of any roofing tiles as of this date?
A No.
Q Here, you'll see a line item on the bottom of page Bertisen_001158 that says, "Less depreciation $20,843.33"; is that correct?
A Correct.
Q Is that depreciation applicable to the entire appraisal award?
A It appears so, based off of Ms. McGowan's breakdown.
Q Okay. You mentioned earlier that the umpire issued an e-mail explaining her thought process with respect to the award. Is this that e-mail I've pulled up, a document Bates labeled Bertisen_00825 through 826?
A Yes, it is.
Q Does Travelers consider this e-mail to be a part of the appraisal award?
A I -- it -- it appears to be a -- an opinion of Ms. McGowan on how she came to her appraisal, and the award that it was ultimately assigned by her and Mr. Trujillo.
Q My understanding of this e-mail is that it indicates that the umpire was of the opinion that the roofing tiles on the Bertisens' roof were no longer

Page 101

manufactured by the original manufacturer, so no new tiles from the original manufacturer were available. Is that your understanding of what she's saying here?
MR. DEVILLING: Object to form.
A That's what she's stating, but that's not an accurate statement based off of J.S. Held's report that those tiles were still available.
Q So can you read point number 4 out loud for me, please?
A "Therefore, it would be necessary to rely upon salvage roof tiles to replace the portions of the roof that were damaged by hail. Based on my personal discussion with the salvage yard noted by J.S. Held, there's no assurance that any and/or any inadequate number of roof tiles are available to replace the portions of the roof that were damaged by hail. Further, there's no assurance as to the quality or appearance of the salvage roof tiles as to whether they might perform or look the same as the existing roof tiles. No evidence was submitted to me to demonstrate the use of salvage tiles would restore the roof to a previous condition prior to the hailstorm event on May 8, 2017, which would require a sufficient number of roof tiles of the type, size, profile, quality, color, texture, patina, et cetera, to replace the portions of roof that

Page 102

were damaged by hail."
Q So it looks to me as though Linda McGowan is referring to J.S. Held's report and to the conclusion or suggestion by J.S. Held that some of those roofing tiles are commercially available, like you just suggested, correct?
A They are, but she outlines salvaged tiles. There -- there are new and -- and unused tiles that are available within those different boneyard companies. And I'm not sure when she had called to make that -- that determination that -- that she relied on. But they do offer new, along with reclaimed tiles, but they do offer new and unused roof tiles.
Q How do you know that?
A Based on prior experience with that same company.
Q Is that -- by "prior experience," do you mean, like, you've talked to them before, or you've purchased tiles from them, or what's the extent of your experience?
A Through talking with them, through reviewing their website to show (clears throat) -- excuse me -- through talking with them, visiting their location, reviewing their website, which has a, you know, detailed inventory of the different tiles that

Page 103

they have available to them, and working with them within the Denver metro area.
Q Did Travelers put the same weight on this e-mail as it did on the letter opinion?
A The letter opinion, the previous letter opinion from Ms. McGowan?
Q Yes.
A Well, I believe this letter was received after Mr. And Ms. Bertisen had filed suit against Travelers, so it would've been reviewed with counsel. But a portion of this, you know, relies on opinion and beliefs, so I couldn't speak to what weight that Travelers put specifically on this letter.
Q And you see point number 5, she says, "While some of these factors are related to the aesthetics of the roof, aesthetics are not the sole or even primary reason. It was, and remains my opinion, that the entirety of the roofing" -- "tile roofing should be removed and replaced"; is that correct?
A That's correct.
Q And she specifically states that she believes that portions of the roof were damaged by hail on May 8, 2017, correct?
A Correct.
Q Did Travelers authorize any payments in

Page 104

response to this e-mail?
A To the best of my knowledge, no.
Q As you sit here today, has Travelers still not authorized payment for any roofing tiles?
A To the best of my knowledge, no, we have not.
Q Okay. I'm going to flip back to that denial letter, Exhibit 3 from the prior deposition. Okay. Here at the middle of the second paragraph on the page Bates labeled Bertisen_001175, it states, "During this inspection, both Travelers and Ladder Now found limited right corner cracking on a few roof tiles, but also found that such damage was consistent with wear and tear, and not indicative of hail damage." Did I read that correctly?
A Yes.
Q Didn't Ladder Now's report say that the cracking was due to mechanical damage?
A Yes.
Q And here on page -- on the second page, it says, "The limited damage to the roof caused by hail was previously included in Travelers' estimates and payments sent to the insureds." Did I read that correctly?
A Yes.
Q But Travelers never issued any payment for the roofing tiles, correct?

Page 105

A Correct. No payments have been issued for the roof tiles.
Q And so -- sorry, just to back up and read the rest of that paragraph from the beginning, "During the appraisal process, Travelers' appraiser, Seth McClure, retained Jeffrey Anderson, a licensed architect with J.S. Held, to perform a roof assessment to determine whether the concrete tile roof at the property was damaged by hailstones on May 8, 2017. During his investigation, Mr. Anderson found that the majority of the cracked tiles" -- "cracked roof tiles he observed at the property were both cracked and justified replacement prior to the May 8, 2017, storm event. The limited damage to the roof caused by hail was previously included in Travelers' estimates and payments sent to the insureds." Now, I understand that to indicate that payment for the cracked roof tiles that were attributed to the May 8, 2017 storm event had already been issued. Is that your understanding of what that states?
A My understanding is that the payment included for the roof ends, the metals on the roofs, along with the skylights.
Q But you see that that section also talks about how J.S. Held, Mr. Anderson found that the majority, 70 percent, of the cracked roof tiles he observed at the

Page 106

**property were both cracked and justified replacement prior to May 8, 2017. That indicates to me that 30 percent of the cracked roof tiles were attributed to be part of the hailstorm and that Travelers here is stating that they had already issued payment for those roofing tiles. Is that not what you see?**

MR. DEVILLING: Object to form.

A It says the limited damage to the roof caused by the hail and the estimates that Travelers has issued payments off of have not included any replacement of any tiles.

**Q Okay. What is Travelers' understanding of the appellate decision that was issued in BonBeck Parker versus Travelers?**

MR. DEVILLING: Let me just object.

A I -- am I okay to --

MR. DEVILLING: Let me object -- let me just object and instruct you not to answer on that. I -- my understanding of the judge's order on that was that we could get into how, if at all, that decision was applied to this case and what we meant by including it in that letter. But I don't think our general understanding of the case is within the scope of what the judge permitted on that issue.

BY MS. GOODRICH:

Page 107

**Q Okay. Let me ask a different question, then. So it says here, "It is Travelers' position that appraisal is not a form to determine coverage or causation, and this issue is currently pending appellate review by the 10th Circuit in the Travelers Indemnity Company versus BonBeck Parker, 20-1192"; is that correct?**

A Correct.

**Q Why did Travelers cite to this pending appeal in this letter?**

A Because there was a dispute regarding appraisal and -- and allowing the appraisal process to encompass causation issues.

**Q Did Travelers issue a revised partial denial letter after the decision came out in that appellate case?**

A I do not believe at that point, we would. It was under litigation, so any correspondence would've been completed by counsel.

**Q Did Travelers instruct its counsel to issue any revisions to this letter as a result of the appeal that came out in that case?**

MR. DEVILLING: I'm going to instruct you not to answer that. That's attorney-client privilege.

MS. GOODRICH: Oh, yeah. Fair enough.

Page 108

BY MS. GOODRICH:

**Q Did Travelers engage in any internal review as to whether it should change its partial denial as a result of the appeal that came out in Travelers versus BonBeck?**

A I don't know.

**Q What can I pull up in order to help you answer that question?**

A I don't think there would've been anything in the discovery documentation and then in my review that -- that would give me anything to provide that answer.

MS. GOODRICH: Okay. I'm going to pull up one of Travelers' internal policies, so we're going to need this part of the deposition to be marked as confidential.

COURT REPORTER: We're good.

(CONFIDENTIAL PORTION I REDACTED)

MR. DEVILLING: Can we maybe take a little break at this point? We've been going about an hour.

MS. GOODRICH: Sure. Do you want a break for lunch?

MR. DEVILLING: I'll leave that up to you too. I'm okay myself, but, Adrian?

Page 109

THE WITNESS: I mean, I can be back in less than 30 minutes if --

MR. DEVILLING: Want to just have a 30-minute break, grab a bite to eat?

MS. GOODRICH: Yeah, 30 minutes sounds good. I probably have -- it's hard to estimate, but, like, another hour to two hours to go.

MR. DEVILLING: Sounds good.

COURT REPORTER: Okay. All right. We're off the record. The current time is 12:15 Mountain.

(OFF THE RECORD)

COURT REPORTER: Okay. We are back on the record. The current time is 12:47 Mountain. You may continue.

MS. GOODRICH: And I'm just going to recap for a second. So if we could mark this first part confidential, because I'm going to be referring to that confidential document again.

(CONFIDENTIAL PORTION II REDACTED)

BY MS. GOODRICH:

**Q Okay. I'm going to flip to another document, so this part no longer has to be marked as confidential. Have you seen this document before?**

A Yes.

**Q When is it dated?**

Page 110

A August 3, 2021.
Q And it looks as though it is a payment letter, where Travelers is saying that they're issuing a check for $20,843.33 for recoverable depreciation; is that correct?
A Correct.
Q Now, do you remember earlier what depreciation was for the full appraisal award?
A Not off the top of my head, no, not off memory.
Q Okay.
MS. GOODRICH: So I'm going to have this marked as Exhibit 13, depreciation payment letter, and it is Bates labeled Bertisen_001160.
(EXHIBIT 13 MARKED FOR IDENTIFICATION)
BY MS. GOODRICH:
Q And, again, that states that they're paying -- that Travelers is paying depreciation for $20,843.33, correct?
A Correct.
Q Okay. I'm going to flip back to Exhibit 8, the claim log. Sorry, scratch that. I'm going to flip to Exhibit 3 from the prior deposition. So in looking at this letter on the page labeled Bertisen_001158, what is the amount of depreciation listed here?

Page 111

A 20,843.33.
Q And is that depreciation for the entire appraisal award?
A That appears to be what that total is.
Q So was it in error for Travelers to pay depreciation from the entire appraisal award, including the disputed amounts?
A I'm not sure what the process was from the -- the adjuster that released that payment. Should have gone back to his original claim file note to see what the depreciation was that they initially applied based off of their calculations.
Q Okay. I'm going to flip back to Exhibit 8, the claim file, and try to find that note.
A It's right there, I believe.
Q I think that there's another note --
A Yeah.
Q -- that's a little clearer, yeah. So we're looking at Travelers_000080 on Exhibit 8. Now, looking at this document, can you tell me what depreciation was for the entire claim, including the disputed and undisputed portions of the appraisal award?
A Yeah, I assume we're just -- still just looking at the dwelling portion, correct?
Q Yes.

Page 112

A Okay. The depreciation that was applied was -- the -- the depreciation that was still recoverable was $20,270.65.
Q And do you see anything to indicate what the figure that was ultimately paid for depreciation is comprised of?
A What was that total again?
Q It was 20,000 on -- I'll pull it back up -- $20,843.33.
A No, I don't see, based on these notes, how he released the depreciation that he did.
Q Are you aware of any estimate associated with the depreciation payment letter that would calculate what those figures are?
A No, I'm not.
Q Okay.
MS. GOODRICH: And did we mark this as Exhibit 13 already?
COURT REPORTER: Let me look. Yes, I've got it as 13.
MS. GOODRICH: Okay. Thank you.
BY MS. GOODRICH:
Q Can you tell, looking at this letter, what the $20,843.33 payment is for?
A All that letter states is it's for recoverable

Page 113

depreciation. Outside of that, I'm not sure.
Q Do you know what prompted Travelers to issue the depreciation payment on August 3, 2021?
A I believe the contractor submitted documentation to show the -- the work, the undisputed work was completed. And, therefore, Dan, the handling adjuster, released a depreciation payment.
Q Okay. Great. I'm going to pull up another document on the screen. This document is Bates labeled TRVSUPP00001 through 14. Do you know what this document is?
A It appears to be the file notes.
Q Okay.
MS. GOODRICH: I'll have this marked as Exhibit 14.
(EXHIBIT 14 MARKED FOR IDENTIFICATION)
Q Do you see here where it states -- or can you just tell me what the date on this note on page 5 is?
A April 16, 2021.
Q Okay. And what does the note say?
A "Claim office forwarded a bill from The Roof Doctor showing to be final invoice for roof in the amount of $157,141.19."
Q So Travelers received a bill from The Roof Doctor in April 2021 saying that the roof was invoiced,

Page 114

correct?
A I'm not sure what the 157,000 encompasses, but we received an invoice showing that work was completed at the property.
Q Okay. And then on May 14, 2021, what does this note state?
A "Status request to claims professional Dan Lehmkuhl on the review of the RCV payment."
Q And can you tell me what happened after that status request was sent, without revealing any attorney-client privilege?
A I am unaware.
Q It looks as though the note starting on page 3 on August 3, 2021, states, "I have reviewed the roofing invoice, confirmed work is complete. I will issue depreciation payment as follows." Did I read that correctly?
A Yes.
Q So The Roof Doctor sent information to Travelers indicating that the roof was complete on May 14, 2021, and then Travelers issued payment on August 3, 2021, correct?
A Yeah. Again, I'm not sure what the invoice specifically was for, without looking at it -- if it encompassed the roof, the elevations, the deck, other

Page 115

portions of the property that were damaged by hail -- but those dates are correct.
Q Do you know what Travelers was doing in-between those dates on this claim?
A No, I do not.
Q Why do you think it would've taken four months for Travelers to issue that depreciation payment?
A You know, I -- I wouldn't want to speculate as to what happened during that time frame. There can be a variety of things. Maybe they needed follow-up with The -- The Roof Doctor. Maybe they needed additional documentation. But I couldn't speak to what happened in that time frame.
Q Okay.
MS. GOODRICH: And this was marked as Exhibit 14?
COURT REPORTER: Yes, it is.
MS. GOODRICH: Okay. Thank you. I'm pulling up another document titled, Defendant's First Amended Answers to Plaintiffs' Interrogatories and Requests for Production." I'm going to have this marked as Exhibit 15.
(EXHIBIT 15 MARKED FOR IDENTIFICATION)
Q Have you seen this document before?
A Yes.

Page 116

Q In preparation for this deposition?
A Yes.
Q Have you seen -- had you seen this document before preparing for this deposition?
A No.
Q I just want to look at interrogatory number 3. It states that this interrogatory asks how Travelers determined that the interior leaks were from a "secondary date" and "secondary occurrence," as those terms were used at Bates Number Travelers_000507; is that correct?
A Yes.
Q And the response from Travelers, can you read that to me, please?
A "See J.S. Held report."
Q So looking at the page indicated in the question, number 507, that's on Exhibit 8, and we're looking for "secondary date," "secondary occurrence." "We also discussed with you that the interior leak was found to be from a secondary date of loss and a secondary occurrence." And that's page Travelers_000507, correct?
A Correct.
Q So this is the document that that question was referring to. What's the date on this document?

Page 117

A November 27, 2017.
Q Did Travelers have the J.S. Held report as of November 17, 2017?
A I don't believe so, but I would like to see the date on the J.S. Held report just to confirm.
Q We'll see if I can find it. So what's the date on the J.S. Held report?
A July 8, 2019.
Q So did Travelers have the J.S. Held report at this time that it issued the letter that's on page 507?
A No.
Q So could Travelers have relied on the J.S. Held report in determining at this time that the interior water damage was from a second date of loss, the second occurrence?
A No. But I think at this point, when the letter was written, they were basing their coverage position that these were two separate occurrences based on the fact that there was months separating the initial hailstorm and the interior leaks with an on- site inspection that occurred shortly after the storm with no interior damage, a secondary inspection that it was completed after the interior damage occurred with an adjuster, a manager, and -- and reviewed by a property field trainer, that it was determined that these were

Page 118

separate occurrences.

Q Thank you for that clarification. So I want to go back and talk a little bit more about Boneyard Tiles. So based on what you've told me today, it sounds as though Travelers has not issued any payment for replacement roofing tiles for the Bertisens' roof, correct?

A Correct.

Q How would Travelers expect one of its adjusters to estimate for replacing roofing tiles, had Travelers determined the roofing tiles at the Bertisens' home to have been covered?

MR. DEVILLING: Form

COURT REPORTER: Is that an objection, Mr. Devilling?

MR. DEVILLING: Objection to form.

A I'm -- I'm not sure I understand the question.

BY MS. GOODRICH:

Q So Travelers has not issued any payment for roofing tiles to the Bertisens, correct?

A Correct.

Q Seth McClure's estimate did include removal and replacement of some of the roofing tiles, correct?

A Correct.

Q Does Travelers know how Mr. McClure priced the roofing tiles?

Page 119

A I would assume that he either used the pricing through the Xactimate software system, or he may have gotten the information from Jeff Anderson from J.S. Held or from Formula Roofing as to the exact cost for those specific Westtile tiles. Those are the two areas that I can think of that -- that they used to determine the material cost for the tile.

Q And going back to our discussion about how roofing tiles are stored at Formula Roofing in Colorado, I think you agreed that the roofing tiles are stored outside, correct?

A Some of them are. I do know they have an interior portion of the property. I don't know how many are stored in there, what is exactly stored in there, but they do have an outside and inside storage portion. But it does appear from my outside inspection and even reviewing the photos on their website that they do store tiles outside.

Q And with respect to tiles stored outside, do you think that tiles that have been exposed to the elements have been subject to depreciation?

A Potentially. It -- it depends on how they're stored. You know, they're unused, they haven't been installed in a roof, so they haven't gone through the same handling, potentially the same events -- weathering, snow loads, exposure to sun -- that those tiles that have been stored at a Boneyard facility may have gone through.

Page 120

Q The Bertisens here, they have a replacement cost policy, correct?

A Yes.

Q Okay. I'm going to ask a few questions about the overall handling of the Bertisens' claim. Travelers did not hire an engineer during the claims adjustment period, correct?

A Correct.

Q Travelers considered the Bertisens' interior water damage claim to be separate from the exterior roof damage claim, correct?

A Correct.

Q Travelers did not determine the cause of the roof leaks that led to the interior water damage, correct?

A I would say, they didn't determine the specific source. I think it was understood that it was something to do with the roof system itself. What exactly that point of entry for the water is, I didn't see that that was outlined in any of the notes.

Q Travelers did not issue any payment based on its own appraiser's conclusion that at least some of the roofing tiles needed to be replaced, correct?

Page 121

A Correct.

Q In your opinion, did Travelers thoroughly investigate the Bertisens' claims?

A Yes. There were multiple inspections of the property. Third-party companies used to assist us with the proper evaluation of a -- of the tile roofs. There was a manager that was on-site during the review of the damages, and there was the involvement of a property field trainer to review the damages. There was additional reviews completed at the property or of the property, you know, at the desk level by different adjusters and different managers to determine, you know, ultimately what Travelers found to be the damage to the Bertisens' home as a result of the hail storm month on May 8, 2017.

Q Do you think that Travelers' investigation of the Bertisens' claim continued throughout the life of the claim?

MR. DEVILLING: Object to form.

A I believe it was completed, you know, during the initial inspection, during the subsequent on-site inspection, and, you know, multiple times shortly thereafter. I think at one point, Travelers made a