**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 20-cv-03650-NYW-STV

ANITA BERTISEN, and
JASPER BERTISEN,

    Plaintiffs,

v.

THE TRAVELERS HOME AND MARINE INSURANCE COMPANY,

    Defendant.

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Plaintiffs' Motion for Partial Summary Judgment Re: Coverage for Cosmetic Matching (the "Motion" or "Motion for Summary Judgment"). [Doc. 96]. The Court has reviewed the Motion and related briefing and concludes that oral argument would not materially assist in the resolution of the Motion. For the reasons set forth in this Order, the Motion for Summary Judgment is respectfully **GRANTED in part** and **DENIED in part**.

### BACKGROUND

This Court set out the factual and procedural background of this case in its prior Memorandum Opinion and Order, *see* [Doc. 93], and repeats it again here only as necessary. Plaintiffs Anita Bertisen and Jasper Bertisen ("Plaintiffs" or the "Bertisens") initiated this civil action on December 14, 2020, asserting claims against The Travelers Home and Marine Insurance Company ("Defendant" or "Travelers") for breach of contract, common law bad faith, and unreasonable delay or denial of insurance benefits. *See*

*generally* [Doc. 1].  They allege that their Golden, Colorado residence was damaged by a hailstorm that occurred on May 8, 2017, [*id.* at ¶¶ 14–15], and that Defendant breached their insurance contract and acted in bad faith in the handling of Plaintiffs' insurance claim, [*id.* at ¶¶ 101–18].  Relevant here, in the context of the Parties' claim dispute, Plaintiffs demanded an appraisal to determine the "amount of loss" under their insurance contract and an Appraisal Award was issued.  [Doc. 93 at ¶¶ 11, 24].  It is undisputed that Travelers denied payment for all roof tiles that were contemplated in the Appraisal Award.  [*Id.* at ¶ 30].

After the close of discovery, both Parties filed motions for summary judgment.  *See* [Doc. 73; Doc. 74].  Defendant's motion sought summary judgment on each of Plaintiffs' claims for relief, [Doc. 73 at 1–2], while Plaintiffs sought to "confirm the appraisal award" and obtain "partial summary judgment in their favor on their breach of contract claim," [Doc. 74 at 1, 17].

On September 8, 2023, this Court denied Defendant's motion for summary judgment and granted Plaintiffs' motion for summary judgment in part.  *See* [Doc. 93]. First, the Court denied Defendant's motion to the extent it sought summary judgment on the breach of contract claim, rejecting Defendant's argument that its failure to pay the Appraisal Award was not a breach of contract because the Appraisal Award did not determine the cause of the loss.  [*Id.* at 13–16, 19–22].  Relying on the Tenth Circuit's decision in *BonBeck Parker, LLC v. Travelers Indemnity Co. of America*, 14 F.4th 1169 (10th Cir. 2021), this Court held that the Appraisal Award's determination of the "amount of loss" encompasses causation.  [Doc. 93 at 19–22]; *see also* [*id.* at 28 (concluding that the Appraisal Award "is binding as to the amount of loss to the Bertisens' property,

2

including their roof, caused by the May 2017 hailstorm")].  Further, the Court denied summary judgment in Defendant's favor on Plaintiffs' bad faith claims, concluding that Defendant's arguments were "based at least in part on the same unsupported presumption underlying [its] arguments regarding [the] breach of contract claim" and noting that it was undisputed that at least some of the tiles, for which Travelers had issued no payment, were damaged by the hailstorm.  [*Id.* at 34–35].

As for Plaintiffs' motion, the Court confirmed the Appraisal Award, noting that Defendant had failed to formally move to modify or vacate the award.  [*Id.* at 26–27].  The Court also granted Plaintiffs' motion for summary judgment as to their breach of contract claim in part, concluding that, at least with respect to 191 roof tiles which were undisputedly damaged and not paid for, Plaintiffs were entitled to summary judgment in their favor.  [*Id.* at 22, 28–29].  But the Court denied summary judgment beyond those 191 tiles; the Court explained that whether the insurance contract requires replacement of the remaining roof tiles on a cosmetic-matching basis is a legal coverage issue, and Plaintiffs had failed to make any affirmative legal argument explaining why the insurance contract permits matching coverage (and had thus not met their burden of demonstrating that they were entitled to summary judgment in their favor).  [*Id.* at 30–32].

Thereafter, this Court held a status conference with the Parties to discuss the next steps of the case, particularly in light of the unresolved legal issue of whether the Policy includes matching coverage.  [Doc. 94].  The Court granted Plaintiffs leave to file a second motion for summary judgment "with respect to whether or not cosmetic matching is covered" under the Policy.  [*Id.* at 1].  The instant Motion followed.  A five-day jury trial is currently set to begin March 18, 2024.  [Doc. 95 at 1].

3

## LEGAL STANDARD

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way. A fact is material if under the substantive law it is essential to the proper disposition of the claim." *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (quotation omitted). It is the movant's burden to demonstrate that no genuine dispute of material fact exists for trial, whereas the nonmovant must set forth specific facts establishing a genuine issue for trial. *See Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010).

To satisfy its burden at summary judgment, the nonmovant must point to competent summary judgment evidence creating a genuine dispute of material fact; conclusory statements based on speculation, conjecture, or subjective belief are insufficient. *See Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). In considering the nonmovant's evidence, the Court cannot and does not weigh the evidence or determine the credibility of witnesses. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008). Further, the Court may consider only admissible evidence, *see Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1541 (10th Cir. 1995), though the evidence need not be in a form that is admissible at trial—only the substance must be admissible at trial, *see Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016).

## UNDISPUTED MATERIAL FACTS

The following facts are drawn from the Parties' briefing and the record before the Court and are undisputed unless otherwise noted.

1. Travelers insured Plaintiffs' Golden, Colorado residence pursuant to Homeowners Insurance Policy No. 996023717-633-1 (the "Policy"). [Doc. 96 at ¶ 1; Doc. 99 at ¶ 1]; *see generally* [Doc. 73-1].

2. The Policy states that Travelers will "insure against risk of direct physical loss to property described in Coverages A and B." [Doc. 96 at ¶ 2; Doc. 99 at 2, ¶ 2; Doc. 73-1 at 18].

3. Coverage A covers "[t]he dwelling on the 'residence premises' shown in the Declarations." [Doc. 73-1 at 11]. "Residence premises" is defined as "[t]he one family dwelling where you reside." [*Id.*].

4. The Policy also includes a Loss Settlement provision, which states:

**Loss Settlement.** . . . Covered property losses are settled as follows:

. . .

b. Buildings covered under Coverage A or B at replacement cost without deduction for depreciation, subject to the following:

(1) . . . [W]e will pay the cost to repair or replace, after application of any deductible and without deduction for depreciation, but not more than the least of the following amounts:

(a) The limit of liability under this policy that applies to the building;

(b) The replacement cost of that part of the building damaged with material of like kind and quality and for like use; or

(c) The necessary amount actually spent to repair or replace the damaged building.

5

[Doc. 96 at ¶ 6; Doc. 99 at 2, ¶ 6; Doc. 73-1 at 23].[1]

5. On May 8, 2017, a hailstorm caused damage to Plaintiffs' home. [Doc. 96 at ¶ 4; Doc. 99 at 2, ¶ 4].

6. After Plaintiffs submitted an insurance claim, the Parties had a dispute over the valuation of the claim and Plaintiffs demanded an appraisal under the Policy. [Doc. 99 at 3, ¶ 6; Doc. 100 at 2; Doc. 99-2 at 14].

7. During the course of the appraisal process, an engineering firm hired by Travelers's appraiser opined that the type of roof tiles on the Bertisens' roof were no longer manufactured. [Doc. 93 at ¶¶ 14, 16; Doc. 74-2 at 3].

8. In October 2020, an Appraisal Award, signed by the appraisal umpire and Plaintiffs' appraiser, awarded a "replacement cost value" of $157,141.19. [Doc. 99 at 4, ¶ 12; Doc. 100 at 2; Doc. 99-4].

9. On September 3, 2020, the umpire provided a statement of the basis of the Appraisal Award (the "Summary Report"), which said that "the entirety of the tile roofing should be removed and replaced" because it was not "reasonably possible to remove and

---

[1] The Court notes that the Policy contains a provision stating that "*[i]f, at the time of loss, the amount of insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately before the loss*, [Travelers] will pay the cost to repair or replace, after application of any deductible and without deduction for depreciation," but not more than the "replacement cost of that part of the building damaged with material of like kind and quality and for like use." [Doc. 73-1 at 23 (emphasis added)]. Both Parties omit the italicized provision from their recitation of the Policy, *see* [Doc. 96 at ¶ 6; Doc. 99 at 11], and neither Party suggests that the italicized language is material here or affects the interpretation of the Policy. Accordingly, the Court assumes that this language is immaterial for purposes of coverage here.

replace only some of the tiles or to remove some areas of tiles . . . without compromising the aesthetics of the roofing." [Doc. 99 at 5, ¶¶ 15–16; Doc. 100 at 2; Doc. 99-5 at 1].[2]

10.  In the Summary Report, the umpire accepted Plaintiffs' appraiser's estimate of $65,590.71 (replacement cash value) for the removal and replacement of all roof tiles and vents, indicating that the basis for the estimate of the replacement cost value was "can't match tile." [Doc. 99 at 5, ¶¶ 18–19; Doc. 100 at 2; Doc. 99-5 at 3].

11.  On March 16, 2021, the umpire emailed the appraisers and Plaintiffs, stating:

> As described in my proposals and letter dated September 3, 2020, I provided a summary of our opinions. I did not propose to and we did not prepare an evaluation report; therefore, my summary of opinions was brief. Nonetheless, the following factors were associated with my determination of the award relative to the roofing:
>
> 1. I believe that portions of the roof were damaged by hail on May 8, 2017.
> 2. I believe that portions of the roof were damaged prior to the hail storm event on May 8, 2017, although the hail may have dislodged some tiles that were previously cracked.
> 3. I believe the tiles are no longer manufactured by the original manufacturer, no new tiles from the original manufacturer are available, and no new, identical tiles are manufactured by another manufacturer.
> 4. Therefore, it would be necessary to rely upon "salvage" roof tiles to replace the portions of the roof that were damage[d] by hail. Based on my personal discussion with the salvage yard noted by J.S. Held, there is no assurance that any and/or an adequate number of roof tiles are available to replace the portions of the roof that were damaged by hail. Further, there is no assurance as to the quality or appearance of the salvage roof tiles as to whether they might perform or look the same as the existing roof tiles. No evidence was submitted to me to demonstrate that use of salvage tiles would restore the roof to its previous condition prior to the hail storm event on May 8, 2017, which would require a sufficient number of roof tiles of the type, size, profile, quality, color, texture, patina, etc. to replace the portions of the roof that were damaged by hail.

---

[2] Defendant states that the Summary Report came "[m]ore than a month later," [Doc. 99 at 5, ¶ 15], but it is not clear what Defendant means. The Court notes that Defendant also states that the Appraisal Award was issued on October 13, 2020, [id. at 4, ¶ 12], that the actual Appraisal Award was signed by the umpire October 15, 2020, see [Doc. 99-4 at 1], and that the Summary Report is dated September 3, 2020, [Doc. 99-5 at 1].

7

> 5. **While some of these factors are related to the aesthetics of the roof, aesthetics are not the sole or even primary reason is was [sic] and remains my opinion that the entirety of the tile roofing should be removed and replaced.**

[Doc. 99 at 6, ¶ 21; Doc. 100 at 2; Doc. 99-6 at 1 (emphasis in original)].

12. Plaintiffs completed repairs to their property for the replacement cost amount set forth in the Appraisal Award—$157,141.19—and requested reimbursement from Travelers. [Doc. 96 at ¶ 5; Doc. 99 at 2, ¶ 5; Doc. 74-9 at 113:17–114:4].[3]

13. Travelers issued a payment of $63,385.07, which did not include payment for roofing items. [Doc. 99 at 6, ¶ 20; Doc. 100 at 2; Doc. 99-2 at 26]. The award was calculated as follows:

| | |
|---|---|
| Appraisal Award (RCV): | $157,141.19 |
| Less Depreciation: | -$20,843.33 |
| Actual Cash Value: | $136,297.85 |
| Less Deductible: | -$1,000.00 |
| Less Prior Payments: | -$14,572.94 |
| Less uncovered amounts incl. in award: | -$57,339.84 |
| **Total Payment Due:** | **$63,385.07** |

[Doc. 93 at ¶ 25; Doc. 74-11 at 2–3 (emphasis in original)].

## ANALYSIS

### I. Interpreting Insurance Contracts Under Colorado Law

Because this Court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332, *see* [Doc. 1 at ¶ 5], the Court applies the substantive law of the forum state, *Barrett v. Tallon*, 30 F.3d 1296, 1300 (10th Cir. 1994). Colorado law provides that interpretation of an insurance contract is "governed by the law of the state with the most

---

[3] When citing to transcripts, the Court cites to the page and line numbers appearing on the transcript pages. In all other instances, the Court cites to the document and page numbers assigned by the Case Management/Electronic Case Filing ("CM/ECF") system.

8

significant relationship to the insurance contract." *Berry & Murphy, P.C. v. Carolina Cas. Ins. Co.*, 586 F.3d 803, 808 (10th Cir. 2009). The Parties do not expressly engage in a choice-of-law analysis in their briefing or direct the Court to a choice-of-law provision in the Policy, but both Parties proceed as if Colorado law applies. *See* [Doc. 96 at 8–9; Doc. 99 at 7–8]. The Court thus assumes that Colorado law applies here. *See Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008) ("Because the parties' arguments assume that Colorado law applies, we will proceed under the same assumption.").

"An insurance policy's terms are construed according to principles of contract interpretation: a court seeks to give effect to the intent and reasonable expectations of the parties." *Auto-Owners Ins. Co. v. High Country Coatings, Inc.*, 388 F. Supp. 3d 1328, 1333 (D. Colo. 2019). Under this approach, "words should be given their plain and ordinary meaning unless the intent of the parties, as expressed in the contract, indicates that an alternative interpretation is intended." *Chacon v. Am. Fam. Mut. Ins. Co.*, 788 P.2d 748, 750 (Colo. 1990). "In determining the plain and ordinary meaning of a term in an insurance policy, the Colorado Supreme Court has eschewed the use of 'technical readings' and instead looks to 'what meaning a person of ordinary intelligence would attach to' a policy term." *Sullivan v. Nationwide Affinity Ins. Co. of Am.*, 842 F. App'x 251, 254 (10th Cir. 2021) (quoting *Bailey v. Lincoln Gen. Ins. Co.*, 255 P.3d 1039, 1051 (Colo. 2011)).

If the terms of an insurance policy are ambiguous, i.e., they are "susceptible to more than one reasonable interpretation," *Cary v. United of Omaha Life Ins. Co.*, 108 P.3d 288, 288 (Colo. 2005), then the policy is construed against the drafter and in favor of coverage, *Cotter Corp. v. Am. Empire Surplus Lines Ins. Co.*, 90 P.3d 814, 820 (Colo.

2004).  The mere fact that the parties disagree as to the meaning of insurance policy terms does not render the policy ambiguous.  *See Ad Two, Inc. v. City & Cnty. of Denver*, 9 P.3d 373, 377 (Colo. 2000).  Nor does a split of authority automatically render a policy ambiguous; however, a "comprehensive debate" among courts may demonstrate that policy language is unclear.  *See Hecla Mining Co. v. N.H. Ins. Co.*, 811 P.2d 1083, 1092 n.13 (Colo. 1991) (quotation omitted); *see also Thompson v. Md. Cas. Co.*, 84 P.3d 496, 504 (Colo. 2004) ("If there is a split of authority interpreting an insurance policy provision, then the provision may be ambiguous.").

The policyholder bears the burden of demonstrating coverage under an insurance policy.  *Rocky Mountain Prestress, LLC v. Liberty Mut. Fire Ins. Co.*, 960 F.3d 1255, 1260 (10th Cir. 2020) (applying Colorado law).  If the insured satisfies their burden, the burden shifts to the insurer "to prove the applicability of an exclusion from coverage."  *Id.*  If the insurer meets this burden and demonstrates that an exclusion applies, the burden then shifts back to the insured to show an exception to the coverage exclusion.  *Id.*

## II. Whether the Policy Provides Matching Coverage

The limited question before this Court is whether the Policy provides coverage for cosmetic matching.  *See* [Doc. 94 at 1].  The Policy provides, in pertinent part, that Travelers will "insure against risk of <u>direct physical loss to property</u> described in Coverages A and B." [Doc. 73-1 at 18 (emphasis added)].  It further provides that, with respect to "<u>[c]overed</u> property losses," Travelers will "pay the cost to repair or replace, after application of any deductible and without deduction for depreciation, . . . [t]he replacement cost of <u>that part of the building damaged</u> with material <u>of like kind and quality and for like use</u>." [*Id.* at 23 (emphasis added)].

In arguing that the Policy provides matching coverage, Plaintiffs focus first on the language "of like kind and quality." [Doc. 96 at 9]. Plaintiffs contend that restoring the tile roof with material of "like kind and quality" must include a reasonable match because nothing in the Policy "suggests that the aesthetics of the tile roof [are] not to be included in Travelers' payment on the loss." [*Id.* at 10]; *see also Nat'l Presbyterian Church, Inc. v. GuideOne Mut. Ins. Co.*, 82 F. Supp. 3d 55, 60 (D.D.C. 2015) (concluding that the language "other property of like kind and quality" "could be read to mandate property that looks the same"). According to Plaintiffs, an end result of a mismatched tile roof would leave Plaintiffs with a "different, worse" roof aesthetic, which "is not a solution that restores the roof's value and does not fulfill the [P]olicy's promise of 'like kind and quality.'" [Doc. 96 at 11].

Travelers focuses on different Policy language. It argues that because the Policy covers only property that experiences "direct physical loss," the Policy covers "only tiles that were physically altered." [Doc. 99 at 10]. Travelers also highlights that, under the Policy, the settlement of losses cannot exceed the replacement cost of "that part of the building <u>damaged</u>" or the amount actually spent to "repair or replace the <u>damaged</u> building," which Travelers asserts "underscores the parties' intent to only cover physically damaged property, not cosmetic mismatches resulting from replacement of damaged property." [*Id.* at 11 (emphasis altered)].

Plaintiffs, in their Reply, dispute Travelers's narrow interpretation of the Policy. Plaintiffs frame the relevant inquiry as whether the Policy's use of "property" refers to the smallest divisible unit possible—i.e., each individual tile on the Bertisens' roof—or the dwelling (i.e., Plaintiffs' residence) "as a unified whole." [Doc. 100 at 3–5]. Plaintiffs

11

assert that the Policy should be construed as covering against damage to the home or the roof as a whole, rather than only providing limited coverage over the specific tiles that were damaged in the hailstorm. [*Id.* at 5]. Finally, Plaintiffs argue that at the very least, the Policy is ambiguous and should be construed in their favor. [*Id.*]. While both Parties direct the Court to case law demonstrating a split of authority interpreting the same or similar policy language, *see* [Doc. 96 at 9–12; Doc. 99 at 7–12], these cases are of limited utility here, as the issue before this Court is whether *this* Policy, under *these* factual circumstances, unambiguously provides or excludes matching coverage or whether the Policy is ambiguous on this point. See *Nat'l Presbyterian Church*, 82 F. Supp. 3d at 59.

The Court first considers the meaning of the Policy's language requiring "direct physical loss to property." [Doc. 73-1 at 18]. Because "direct physical loss" is not defined in the Policy, the Court may use dictionary definitions to ascertain its plain meaning. *Thompson*, 84 P.3d at 502. "Direct" is defined as "without any intervening agency or step" or "without any intruding or diverting factor"; "physical" is defined as "of or relating to natural or material things as opposed to things mental, moral, spiritual, or imaginary"; and "loss" is defined as "the act or fact of losing : . . . deprivation." See *Webster's Third New Int'l Dictionary* 640, 1338, 1706 (1993). The Court does not disagree with Defendant's general assertion that "direct physical loss" requires that property be tangibly physically damaged; by its plain terms, the Policy covers property that is immediately and perceptibly harmed in a tangible manner. See *Goodwill Indus. of Cent. Okla., Inc. v. Phila. Indem. Ins. Co.*, 21 F.4th 704, 710 (10th Cir. 2021) (applying Oklahoma law and relying on dictionary definitions to conclude that the plain meaning of "direct physical loss" "encompasses only tangible destruction or deprivation of property" and "requires an

immediate and perceptible destruction or deprivation of property"); *Windridge of Naperville Condo. Ass'n v. Phila. Indem. Ins. Co.*, 932 F.3d 1035, 1040 (7th Cir. 2019) ("*Windridge II*") (applying Illinois law and analogizing "direct physical loss" to "property that has been damaged").

Despite this fairly straightforward conclusion about the meaning of the phrase "direct physical loss" in isolation, the meaning of "direct physical loss *to property*" in the context of this particular Policy is not so clear. While Travelers insists that this language encompasses "only tiles that were physically altered," [Doc. 99 at 10], Travelers directs the Court to no Policy language that plainly supports such a narrow interpretation. It is not clear in the Policy whether the "property" that must suffer "direct physical loss" to trigger coverage refers to the smallest possible divisible unit of property, i.e., a single roof tile; a larger divisible unit of property, such as the roof as a whole; or the Plaintiffs' dwelling as an entire unit.

Indeed, the Policy limits coverage to "direct physical loss to <u>property described in Coverages A and B</u>." [Doc. 73-1 at 18 (emphasis added)]. Relevant here, Coverage A covers "[t]he dwelling on the 'residence premises,'" which is defined broadly in the Policy as "[t]he one family dwelling where [the insureds] reside." [*Id.* at 11]. In light of this broad language, it would not be unreasonable to interpret the "property" experiencing "direct physical loss" to refer to Plaintiffs' residence *as a whole*, such that direct physical damage to Plaintiffs' home triggered coverage. In any event, the specific unit of "property" that must suffer a "direct physical loss" is not clear under the Policy. *Cf. Nat'l Presbyterian Church*, 82 F. Supp. 3d at 59 (finding it ambiguous whether insurance policy's coverage of damaged property referred "to the smallest unit possible (an individual panel, a single

shingle, a specific patch of flooring) or to one larger (the entire façade, the whole roof, a continuous stretch of flooring)"); *Windridge II*, 932 F.3d at 1040 ("'Covered property' could be interpreted to mean each panel of siding, or to mean the entire damaged sides of buildings, or the entire damaged buildings."); *Trout Brook S. Condo. Ass'n v. Harleysville Worcester Ins. Co.*, 995 F. Supp. 2d 1035, 1042 (D. Minn. 2014) (concluding that "covered property," which extended to "buildings and structures," referred to each of the insured's buildings as a whole, rather than to "individual items (such as shingles or siding) attached or appurtenant to them").

The same is true for the portion of the Policy that states the settlement payment will not exceed the replacement cost of "that part of the building damaged." [Doc. 73-1 at 23]. This phrase is not defined in the Policy. *See generally* [*id.*]. Considering the language's plain meaning, the "part of the building damaged" means the part of the building that is "hurt, injure[d], [or] impair[ed]." *Webster's Third New Int'l Dictionary* 571 (1993) (defining "damage").

Travelers argues that because "[t]here is no provision for payment for repair or replacement of undamaged property components," this Policy language is intended to "only cover physically damaged property, not cosmetic mismatches resulting from replacement of damaged property." [Doc. 99 at 11 (emphasis altered)]. But again, there is nothing in the Policy supporting Defendant's insistence that covered property must be reduced to indeterminate "components" for purposes of coverage. Travelers could have drafted the Policy to contemplate that any damage to Plaintiffs' residence would be measured at a granular level, but it did not do so. *See Republic Ins. Co. v. Jernigan*, 753 P.2d 229, 234 (Colo. 1988) (noting that if the insurer intended to limit the policy's

coverage, it could have included a limiting provision in the insurance contract); *Ferndale Dev. Co. v. Great Am. Ins. Co.*, 527 P.2d 939, 940–41 (Colo. App. 1974) (same).

Again, this portion of the Policy provides limitations on the settlement of claims concerning "[b]uildings covered under Coverage A"—i.e., Plaintiffs' dwelling. [Doc. 73-1 at 11, 23]. While it may be reasonable to view a single damaged roof tile, or a certain number of damaged roof tiles, as a "part of the building [that is] damaged," it is equally reasonable to view the roof as a singular damaged unit that is "part of the building [that is] damaged." *See Windridge of Naperville Condo. Ass'n v. Phila. Indem. Ins. Co.*, No. 16-cv-03860, 2018 WL 1784140, at *3 (N.D. Ill. Apr. 13, 2018) ("*Windridge I*") ("[W]hile it would be correct as a matter of ordinary usage to say that the storm damaged the siding on the building's south and west elevations, it would be just as correct to say that the storm damaged the building's siding, period."), *aff'd*, 932 F.3d 1035; *cf. Rumbley v. State Farm Fire & Cas. Co.*, No. 3:21-cv-00209-KHJ-MTP, 2022 WL 1278091, at *3 (S.D. Miss. Apr. 28, 2022) (finding that the interpretation of "damaged part of the property" turns on the facts of the insurance dispute, as "the 'damaged portion' of the home could be either the broken shingles or the entire roof (or anything in between), depending on whether merely replacing individual shingles satisfactorily repairs the whole dwelling"). Given this uncertainty, this Policy language does not unambiguously exclude matching coverage.

Even if the "part of the building damaged" unambiguously referred only to the damaged tiles—which the Court does not find—the immediately following language injects ambiguity right back into the Policy. The Policy provides that the replacement cost cannot exceed the cost to replace "that part of the building damaged <u>with material of like kind and quality and for like use</u>." [Doc. 73-1 at 23 (emphasis added)]. Again, the Policy

15

does not define "of like kind and quality."  *See generally* [*id.*]; *but see Webster's Third New Int'l Dictionary* 1243, 1310, 1858 (1993) (defining "like" as "the same or nearly the same . . . : equal or nearly equal"; "kind" as "fundamental nature or quality : essence"; and "quality" as a "distinctive inherent feature" or "degree of conformance to a standard").

Plaintiffs interpret the use of "like kind and quality" to require matching, arguing that simply replacing only the damaged tiles—which Plaintiffs contend are no longer manufactured—with replacement tiles would leave Plaintiffs with a mismatched roof, such that the unmatching replacement tiles would not be of "like kind and quality" to those tiles that were replaced, and Plaintiffs would not be made whole.  [Doc. 96 at 10].  Travelers does not respond directly to this argument.  *See* [Doc. 99 at 7–12 (arguing that Plaintiffs erroneously focus on the language "of like kind and quality," but offering no competing interpretation of the language)].

The Court agrees that Plaintiffs' position is a reasonable interpretation of the Policy language.  Courts have concluded that language requiring that replacement materials be of "like kind and quality" can reasonably be read to encompass matching coverage.  *See Nat'l Presbyterian Church*, 82 F. Supp. 3d at 60 (concluding that "like kind and quality" "could, itself, be read to require matching" and "could be read to mandate property that looks the same"); *Moeller v. Farmers Ins. Co. of Wash.*, 267 P.3d 998, 1002 (Wash. 2011) ("the term 'like kind and quality' means a restoration of appearance, function, and value" (quotation omitted)).  Replacing the broken tiles with tiles that fail to match the remainder of the roof would arguably not be replacing the broken tiles with tiles of "like kind and quality."  *Cf. Trout Brook S. Condo. Ass'n*, 995 F. Supp. 2d at 1044 ("The term[] . . . 'material of like kind and quality' simply cannot be defined, as a matter of law, to preclude

consideration of color."). Furthermore, the Court notes that replacement-cost coverage "by definition[] provides a 'make-whole' remedy." *FSC Paper Corp. v. Sun Ins. Co. of N.Y.*, 744 F.2d 1279, 1283 (7th Cir. 1984) (applying Illinois law); *see also McFarland v. State Farm Fire & Cas. Co.*, No. 17-cv-00291-MSK-STV, 2017 WL 3034623, at *2 (D. Colo. July 18, 2017) (explaining that, under replacement cost coverage, "the insured receives the amount to replace the asset"); A. Windt, 3 Insurance Claims and Disputes § 11:35 (6th ed. 2023) (explaining the differences between replacement cost and actual cash value). Replacing only the damaged tiles, which Plaintiffs contend would leave them with a mismatched roof, would not make Plaintiffs whole. *See Windridge II*, 932 F.3d at 1042 ("Windridge seeks only to be put back in the position it was in before the storm. Having mismatched siding on its buildings would not be the same position.").

For these reasons, the Court concludes that the Policy is ambiguous as to whether it requires matching coverage, *Cary*, 108 P.3d at 290, and the Court is therefore required to construe the Policy in favor of coverage, *Cotter Corp.*, 90 P.3d at 820. Matching is therefore required under the Policy. *Nat'l Presbyterian Church*, 82 F. Supp. 3d at 60. The Motion for Summary Judgment is therefore **GRANTED** to the extent it seeks a determination that matching is required under the Policy.

### III.   Plaintiffs' Remaining Arguments

This Court granted Plaintiffs leave to file a second summary judgment motion only "with respect to whether or not cosmetic matching is covered" by the Policy. *See* [Doc. 94 at 1]. However, Plaintiffs' Motion for Summary Judgment goes beyond the Court's limited grant of leave by arguing that whether or not there are available replacement materials "of like kind and quality" is a fact question that was conclusively resolved by the

17

appraisal panel, such that the Court must "defer to the appraisal panel's findings," [Doc. 96 at 12–14], and further asserting that salvaged tiles fail to meet the Policy's requirement of replacement cost without deduction for depreciation, [*id.* at 14–20].

These arguments are not properly before the Court. As previously explained, Plaintiffs could have, but did not, affirmatively brief the coverage issue in their original summary judgment motion. *See* [Doc. 74]. Because this case could not proceed to trial without a legal coverage determination, the Court granted Plaintiffs leave to further brief *only* the legal issue of whether matching coverage exists under the Policy—not ancillary factual issues that could have been, but were not, raised in Plaintiffs' original summary judgment motion. *See* [Doc. 94]; *cf.* NYW Civ. Practice Standard 7.1D(a) ("Absent leave of the Court, which will only be granted in exceptional circumstances, a party may file only one motion for summary judgment."). Thus, this Court respectfully declines to rule on these matters at this juncture.

Nevertheless, in so ruling, the Court makes the following observations. The Appraisal Award is binding on all matters within the scope of the appraisal. *See Concept Rests., Inc. v. Travelers Indem. Co.*, No. 16-cv-00450-DME-NYW, 2016 WL 8737773, at *2–3 (D. Colo. Dec. 2, 2016). It is not binding, however, on matters outside of the appraisal's scope. *Id.* at *3. An issue may be outside of the scope of an appraisal if "it involves a legal construction of the insurance policy itself" or if "the parties agreed on some limitation or restriction." *Id.* Having resolved the legal construction of the Policy, the questions remaining are factual ones—whether or not two or more of the appraisal panel's members resolved whether there were appropriate replacement materials of "like kind and quality" when issuing the Appraisal Award with a replacement cost value of

$157,141.19 and whether the Parties agreed to some limitation or restriction excluding the issue of the availability of appropriate replacement tiles from the appraisal panel's scope.

The face of the Appraisal Award does not reflect any express factual findings, or any limitation or restriction as to the appraisal's scope, with regard to the availability of matching tiles in the market that would be "of like kind and quality" and allow for appropriate cosmetic matching.  *See* [Doc. 99-4 at 1].  Plaintiffs provide no legal authority to allow this Court to accept the umpire's independent post-award explanations—without more—as binding factual determinations as to the availability of tiles of "like kind and quality" where the Parties agreed under the Policy that they would be bound by decisions agreed to by at least *two* panel members.  *See generally* [Doc. 96]; *see also* [Doc. 73-1 at 24 ("A decision agreed to by any two" of the umpire and the Parties' appraisers "will set the amount of loss.")].  But Defendant offers no evidence from the other panel members to counter the umpire's explanations, and it is unclear whether such evidence exists.  *See generally* [Doc. 99].

Given the procedural posture of this case, any remaining factual disputes, including whether the availability of tiles of "like kind and quality" was decided by the appraisal panel, and if not, whether there are available tiles of "like kind and quality," will be resolved by the jury.[4]  Accordingly, the Motion for Summary Judgment is **GRANTED**

---

[4] As discussed, the Court's prior Order confirmed the Appraisal Award and ruled that the Award is binding as to the amount of loss—including causation—based on Defendant's failure to formally challenge the appraisal award.  *See* [Doc. 93 at 22–26].  Thus, if the jury finds that the appraisal panel did make a factual finding that there are no available matching tiles on the market, or the jury itself so concludes, the Appraisal Award will provide the definitive, binding replacement cost of the roof as a whole and this Court will not entertain any argument or evidence otherwise.

**in part**, to the extent it seeks a declaration from this Court that the Policy provides coverage for cosmetic matching.  The Court **DENIES** any other relief requested.[5]  In addition, the Court notes that "[a] purpose of appraisal provisions is to avoid litigation and encourage settlement."  See *Auto-Owners Ins. Co. v. Summit Park Townhome Ass'n*, 100 F. Supp. 3d 1099, 1103 (D. Colo. 2015).  Given the record before it, this Court **ORDERS** that the Parties engage in alternative dispute resolution no later than **February 23, 2024**.

## CONCLUSION

For the reasons set forth herein, it is **ORDERED** that:

(1) Plaintiffs' Motion for Partial Summary Judgment Re: Coverage for Cosmetic Matching [Doc. 96] is **GRANTED in part** and **DENIED in part**, as set forth in this Order;

(2) The Parties shall **PARTICIPATE** in alternative dispute resolution no later than **February 23, 2024**; and

(3) No later than **January 26, 2024**, the Parties shall **FILE** a Joint Notice informing this Court of the date upon which the alternative dispute resolution proceeding will occur and the name of the selected mediator.

DATED:  January 8, 2024

BY THE COURT:

_____
Nina Y. Wang
United States District Judge

---

[5] The Court does not address Plaintiffs' arguments concerning whether salvaged tiles fulfill the Policy's requirement that replacement cost be measured without deduction for depreciation, *see* [Doc. 96 at 14–20], given that it exceeds the scope of leave granted by the Court.